In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-4073

EDUARD SHLAHTICHMAN,

*Plaintiff-Appellant,*

*v.*

1-800 CONTACTS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 4032—**John W. Darrah**, *Judge*.

ARGUED APRIL 15, 2010—DECIDED AUGUST 10, 2010

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge*.    After Eduard Shlahtichman purchased contact lenses over the Internet, 1-800 Contacts, Inc. emailed him a confirmation of his order which reflected the expiration date of his credit card. The Fair and Accurate Credit Transactions Act of 2003 ("FACTA") prohibits a vendor who accepts a credit or debit card as a means of payment from "print[ing] more than the last 5 digits of the card number or the expiration date upon

any receipt provided to the cardholder at the point of the sale or transaction," 15 U.S.C. § 1681c(g)(1); the prohibition "appl[ies] only to receipts that are electronically printed," as opposed to those on which the credit or debit card information is written by hand or taken by imprint or photocopy, § 1681(c)(g)(2). Did 1-800 Contacts "electronically print" the expiration date of Shlahtichman's credit card, and thereby violate FACTA, by including it in the email? This is a question of first impression at the appellate level. We answer that question in the negative and affirm the dismissal of Shlahtichman's complaint.

1-800 Contacts sells contact lenses over the Internet and accepts payment by credit card. On or before June 2, 2009, Shlahtichman made an Internet purchase from 1-800 Contacts using his credit card. 1-800 Contacts then sent Shlahtichman a computer-generated email confirming his order. Among the information included in the confirmation was the expiration date of Shlahtichman's credit card. Shlahtichman received the email at his home in Illinois on June 2, 2009. These are the essential factual allegations of Shlahtichman's complaint, and we assume their truth for purposes of reviewing the dismissal of his suit. *E.g.*, *Addis v. Whitburn*, 153 F.3d 836, 837 (7th Cir. 1998).

FACTA amended the Fair Credit Reporting Act of 1970, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"), to add, among other provisions, a "receipt truncation" requirement aimed at combating identity theft. *See* § 1681c(g). As amended, the statute provides:

**Truncation of credit card and debit card numbers**

**(1) In general**

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.

**(2) Limitation**

This subsection shall apply only to receipts that are electronically printed, and shall not apply to transactions in which the sole means of recording a credit card or debit card account number is by handwriting or by an imprint or copy of the card.

**(3) Effective date**

This subsection shall become effective—

**(A)** 3 years after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is in use before January 1, 2005; and

**(B)** 1 year after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is first put into use on or after January 1, 2005.

§ 1681c(g). The statute permits a consumer to recover any actual damages he sustains as a result of a negligent violation, together with the costs of suit, *see* 15 U.S.C.

§ 1681*o*, or statutory damages (without any proof of injury) of $100 to $1000 per violation, along with the costs of suit, if the violation of the statute was willful, *see* 15 U.S.C. § 1681n(1)(A), (3).[1]

Shlahtichman filed a class action suit in Illinois state court on behalf of himself and others similarly situated, contending that 1-800 Contacts had violated the FCRA as amended by FACTA by including the expiration date of a purchaser's credit card in the order confirmations it sent by email. Because the suit arises under a federal statute, 1-800 Contacts removed the action to the district court. *See* 28 U.S.C. §§ 1331, 1441, 1446. It then moved to dismiss Shlahtichman's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief could be granted.

The district court granted the motion and dismissed the suit. *Shlahtichman v. 1-800 Contacts, Inc.*, No. 09 C 4032, 2009 WL 4506535 (N.D. Ill. Dec. 2, 2009); R.26, 28. The court cited two principal reasons for concluding that an emailed order confirmation falls outside the scope of

---

[1] The Credit and Debit Card Receipt Clarification Act of 2007, Pub. L. No. 110-241, 122 Stat. 1565 (enacted June 3, 2008), provided a (partial) safe harbor to vendors who merely printed the expiration date of a consumer's credit or debit card on a receipt prior to June 3, 2008, by declaring that this limited violation of the statute would not amount to a willful violation of the statute. *See* § 1681n(d). However, 1-800 Contacts emailed the receipt to Shlahtichman after June 3, 2008, and so the safe harbor is inapplicable to this case.

the statute. "*First*, e-mail order confirmations are not 'electronically printed' receipts under FACTA." *Id.* at *2 (emphasis ours). Noting that the statute leaves the term "printed" undefined, the court adopted the plain and ordinary meaning of the term, which signifies the transfer of text, images, designs, and other information to paper. *Id.* at *3. It rejected Shlahtichman's contention that the term should also be taken to include the display of information on a computer screen, reasoning that even if the word "print" can be understood in this way, this is not its ordinary import. *Id.* The fact that the effective date of the truncating provision turned on the date on which the vendor's "cash register or other machine or device that electronically prints receipts" came into use confirmed that the provision should be understood to reach receipts that are printed on paper by cash registers and similar devices. *Id.* at *4. And the legislative history revealed that it was the misappropriation of those kinds of receipts that Congress was concerned about when it passed FACTA. *Id.* "*Second*, an e-mail order confirmation is not provided 'at the point of the sale or transaction' under FACTA." *Id.* at *2 (emphasis ours). As other courts had observed, the statutory reference to receipts provided at "the point of the sale or transaction" contemplates in-store transactions rather than electronic commerce. *Id.* at *5. Even if a point of sale can be ascribed to an Internet purchase— Shlahtichman argued that the computer used by the consumer to make the purchase represents the point of sale—an email sent to the purchaser to confirm that purchase is not provided at that point but rather is

directed to an email account that can be accessed any-where. *Id.*

Although Shlahtichman brought this case as a class action, no class was ever certified (no motion asking the district court to do so was filed), so the dismissal of the complaint only disposes of Shlahtichman's individual claim for relief. *See, e.g., Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006). Nonetheless, the district court made clear that it contemplated no further pro-ceedings in this case, *see* R. 26 (deeming the case closed), so its judgment is final and our own appellate jurisdic-tion is secure. *See, e.g., McClain v. Retail Food Employers Joint Pension Plan*, 413 F.3d 582, 585 n.2 (7th Cir. 2005). Consistent with the fact that no class was certified, we shall treat Shlahtichman's complaint as if it were filed solely on his own behalf. *Rutan v. Republican Party of Ill.*, 868 F.2d 943, 947 (7th Cir. 1989) (en banc), *aff'd in part & rev'd in part on other grounds*, 497 U.S. 62, 110 S. Ct. 2729 (1990).

Our review of the district court's decision is de novo. *E.g., Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 434 (7th Cir. 2009). The viability of Shlahtichman's complaint turns on the meaning of FACTA's terms—in particular, the term "print." Absent a definition supplied by the statute itself, we look to the ordinary or natural meaning of the term. *FDIC v. Meyer*, 510 U.S. 471, 476, 114 S. Ct. 996, 1001 (1994) (citing *Smith v. United States*, 508 U.S. 223, 228, 113 S. Ct. 2050, 2054 (1993)); *see also Hardt v. Reliance Std. Life Ins. Co.*, 130 S. Ct. 2149, 2156 (2010). But we must also look to the statute as a whole in discerning

a term's meaning rather than examining it in isolation. *Samantar v. Yousuf*, 130 S. Ct. 2278, 2289 (2010) (quoting *United States v. Morton*, 467 U.S. 822, 828, 104 S. Ct. 2769, 2773 (1984)); *Nken v. Holder*, 129 S. Ct. 1749, 1756 (2009) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846 (1997)). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 1030 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947 (2000)).

As the district court noted, most courts have concluded that the term "electronically printed" reaches only those receipts that are printed on paper, as that understanding of the statute conforms to the ordinary meaning of the term "print." *See Turner v. Ticket Animal, LLC*, No. 08-61038-CIV, 2009 WL 1035241 (S.D. Fla. Apr. 16, 2009); *Smith v. Under Armour, Inc.*, 593 F. Supp. 2d 1281 (S.D. Fla. 2008); *Smith v. Zazzle.com, Inc.*, 589 F. Supp. 2d 1345, 1348 (S.D. Fla. 2008); *Grabein v. Jupiterimages Corp.*, No. 07-22288-CIV, 2008 WL 2704451 (S.D. Fla. Jul. 7, 2008) (report and recommendation of magistrate judge), *adopted*, 2008 WL 2906866 (S.D. Fla. Jul. 28, 2008); *King v. Movietickets.com, Inc.*, 555 F. Supp. 2d 1339, 1340 (S.D. Fla. 2008); *Haslam v. Federated Dep't Stores, Inc.*, No. 07-61871 CIV, 2008 WL 5574762 (S.D. Fla. May 16, 2008); *Narson v. GoDaddy.com, Inc.*, No. CV-08-0177, 2008 WL 2790211 (D. Ariz. May 5, 2008). A minority have concluded that the term should be understood to reach electronic receipts that are displayed on the consumer's computer.

*Romano v. Active Network, Inc.*, No. 09 C 1905, 2009 WL 2916838 (N.D. Ill. Sept. 3, 2009); *Harris v. Best Buy Co.*, 254 F.R.D. 82, 86-87 (N.D. Ill. 2008); *Grabein v. 1-800-Flowers.com, Inc.*, No. 07-22235-CIV, 2008 WL 343179 (S.D. Fla. Jan. 29, 2008); *Vasquez-Torres v. Stubhub, Inc.*, No. CV 07-1328, 2007 U.S. Dist. LEXIS 63719 (C.D. Cal. Jul. 2, 2007).[2] We conclude that the majority view adopted by the district court in this case is on firmer ground.

What FACTA covers are *printed* receipts. The same technological advances that have given consumers multiple means of paying their bills and purchasing goods and services have also made it possible for the receipts confirming those transactions to be provided in the form of a voicemail, email, and text message as well as the traditional paper receipt. But when one refers to a printed receipt, what springs to mind is a tangible document. To "print" a receipt thus ordinarily connotes recording it on paper. "That is why [the plaintiff] had to *print* a copy of his receipt to get it off of his computer; it is why the machine used to transfer text from a computer to paper is called a *printer*; and it is why a

---

[2] An Internet merchant, in addition to or in lieu of sending the consumer a receipt or confirmation via email, may generate a receipt on its website at the time of the transaction, which the consumer may (and is often encouraged to) print out for her records. *See, e.g., Under Armour*, 593 F. Supp. 2d at 1282. We do not view as material the distinctions between a receipt that is displayed on the merchant's website and one that is emailed to the consumer for purposes of the issue presented in this case.

judge who asks a law clerk to *print* a case does not intend for the clerk to merely display the case on his computer screen." *Jupiterimages*, 2008 WL 2704451, at *8 (emphasis in original).

Dictionaries are a helpful resource in ascertaining the common meaning of terms that a statute leaves undefined, *see*, *e.g.*, *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 129 S. Ct. 846, 850 (2009), and a canvass of several leading dictionaries reveals that "print" in its transitive verb form ordinarily connotes the transfer of words or images to a tangible medium—often paper. *See* OXFORD ENGLISH DICTIONARY ONLINE, available at http://english.oxforddictionaries.com (last visited Aug. 5, 2010) ("produce (books, newspapers, magazines, etc.), especially in large quantities, by a mechanical process involving the transfer of text, images, or designs to paper: *a thousand copies of the book were printed*"); MERRIAM-WEBSTER DICTIONARY ONLINE, available at http://merriam-webster.com/dictionary (last visited Aug. 5, 2010) ("**a**: to impress something in or on **b**: to stamp (as a mark) in or on something"); DICTIONARY.COM, available at http://dictionary.reference.com (last visited Aug. 5, 2010) ("to produce (a text, picture, etc.) by applying inked types, plates, blocks, or the like, to paper or other material either by direct pressure or indirectly by offsetting an image onto an intermediate roller") (citing Random House Dictionary). True enough, these sources recognize that the term, when used with reference to computers, also can be understood to mean the display of text on a computer's viewing screen. MERRIAM-WEBSTER DICTIONARY ONLINE ("PRINT OUT; *also*: to display on a surface (as a

computer screen) for viewing"); DICTIONARY.COM ("*Computers.* to produce (data) in legible alphanumeric or graphic form"). For that matter, one can also "print to file" and "print to PDF" (portable document format) in a computer environment without transferring anything to paper. *See* OXFORD ENGLISH DICTIONARY ONLINE ("send (a computer file) to a printer or to another, temporary file"). But these usages of the term, while more frequent in recent years, do not yet represent the ordinary or natural meaning of "print." Shlahtichman suggests that use of the adverb "electronically" in section 1681c(g)(2) ("[t]his subsection shall apply only to receipts that are *electronically printed* . . .") (emphasis ours) evinces a congressional intent to broaden the meaning of the statutory term to include the more modern usages, so that an "electronically printed" receipt will include one that is opened and displayed on the consumer's computer. Yet, the modifier "electronically" appears intended to distinguish those receipts that are printed by machine, as opposed to those which are handwritten or created by taking an impression of the card using an imprinter. *See Active Network*, 2009 WL 2916838, at *3. In any case, whatever sort of printing that the consumer might do on his or her computer is not printing done by a "person that accepts credit cards or debit cards for the transaction of business," § 1681c(g)(1); and it is printing by the vendor, rather than by the consumer, at which the statute is aimed. *Movietickets.com*, 555 F. Supp. 2d at 1341-42; *GoDaddy.com*, 2008 WL 2790211, at *3. An email generated by the vendor might never be viewed or displayed by the consumer and thus might never be printed even in the

expansive sense that Shlahtichman advocates. This leaves Shlahtichman to argue that the vendor "prints" a receipt simply by *sending* the email to the consumer. Shlahtichman Reply at 17-18. But that too is a departure from the ordinary or natural meaning of the term.

Ultimately, "[s]tatutory language only has meaning in context," *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415, 125 S. Ct. 2444, 2449 (2005), and the overall statutory context of FACTA suggests, consistent with the ordinary meaning of the word "print," that the statute is aimed at paper receipts. The statute's ban on printing more than the last five digits of a debit or credit card or the expiration date of the card applies to receipts that are printed and "provided to the cardholder *at the point of the sale or transaction*." § 1681c(g)(1) (emphasis ours). This language has a ready application to face-to-face transactions that take place in a "bricks-and-mortar" store or some comparable physical location at which the consumer is handed a receipt. *See GoDaddy.com*, 2008 WL 2790211, at *5. Its application to Internet purchases raises a host of questions. Where is the point of sale for such a purchase—the consumer's computer? the vendor's headquarters? the vendor's server? cyberspace generally? And is that the *same* point at which an emailed receipt is provided to the consumer? Assuming that these questions can be answered in a way that comports with the statutory language, *see Ehrheart v. Bose Corp.*, Civ. A. No. 07-350, 2008 WL 64491, at *4-*6 (W.D. Pa. Jan. 4, 2008) (on premise that "point of sale or transaction" has no fixed meaning and can refer to a time or event rather than a location, court es-

chews an understanding of the term as used in FACTA that would refer to a particular physical site), a separate subsection of section 1681c(g) points again to traditional, in-store transactions. In subsection 168c(g)(3), Congress specified two different effective dates for the truncation requirement: December 4, 2006, "with respect to any *cash register or other machine or device* that electronically prints receipts for credit card or debit card transactions *that is in use before January 1, 2005*," and December 4, 2004 with respect to any such machine or device "*that is first put into use on or after January 1, 2005*." (Emphasis ours.) The citation of the cash register as the lead example of a machine or device used to electronically print a receipt is consistent with the notion that Congress meant to regulate the types of receipts that document in-person transactions between the consumer and the merchant; few terms bring to mind a store better than "cash register." On the other hand, scores of businesses use the same sorts of computers to generate and print receipts that consumers now possess in their homes, and technological advances are fast blurring the line between traditional cash registers and consumer-owned devices that can perform the same functions. *See*, *e.g.*, Erick Schonfeld, *Square Turns Your iPad Into A Cash Register*, TECH CRUNCH (Apr. 3, 2010), available at http://techcrunch.com/2010/04/03/square-ipad/ (last visited Aug. 5, 2010). More telling, perhaps, is that Congress chose to make the effective date of the truncation requirement dependent on the vintage of the device used to print the receipt. *See GoDaddy.com*, 2008 WL 2790211, at *5; *Federated Dep't Stores*, 2008 WL 5574762, at *4. If the statute applies to

only those receipts that are printed on paper by a vendor using a cash register or similar device, then the two different effective dates comprised a workable scheme. If, however, the statute reaches not only those receipts that are printed by the vendor in the traditional way, but also those that are emailed to the consumer and displayed on the device of her choosing (personal computer, smartphone, etc.), then with respect to the latter subset of receipts, Congress made the effective date of the truncation requirement dependent on a fact (the date the device was first put into use) that was wholly beyond the contemplation and control of the vendor facing liability. Of course, that is water under the bridge now that the later effective date has passed, but it is implausible to think that Congress would have premised a vendor's liability on circumstances that were entirely beyond its control. In short, "[t]he language of § 1681c(g) as a whole clearly shows that the statute contemplates transactions where receipts are physically printed using electronic point of sale devices like electronic cash registers or dial-up terminals." *GoDaddy.com*, 2008 WL 2790211, at *6; *see also Ticket Animal*, 2009 WL 1035241, at *3 ("the terms 'point of the sale' and 'any cash register or other machine or device' immediately evoke the image of a paper receipt"); *Under Armour*, 593 F. Supp. 2d at 1287 (same); *Zazzle.com*, 589 F. Supp. 2d at 1348 (same).

The statutory language strikes us as significant not only for the terms that it uses but for those it does not. E-commerce was common by 2003; retail sales via the Internet reached $56 billion in the United States that year. U.S. Dep't of Commerce, E-Stats: *E-Commerce 2003*

*Highlights*, at 4 (May 11, 2005), available at http://www.census.gov/econ/estats/2003/2003finaltext.pdf (last visited Aug. 5, 2010). Yet the statute makes no use of terms like "Internet" or "email" that would signal an intent to reach paperless receipts transmitted to the consumer via email. Elsewhere, Congress has made explicit that it is including electronic media and transactions within the scope of a statute. *See*, *e.g.*, 15 U.S.C. § 1278(c)(1)(A) (Consumer Product Safety Improvement Act of 2008) ("Any advertisement by a retailer, manufacturer, importer, distributor, or private labeler *(including advertisements on Internet websites* or in catalogues or other printed materials) that provides a direct means for the purchase or order of a product for which a cautionary statement is required under subsection (a) or (b) shall include the appropriate cautionary statement displayed on or immediately adjacent to that advertisement . . . .") (emphasis ours); 15 U.S.C. §§ 7701, *et seq.* (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003) (recognizing that "[e]lectronic mail has become an extremely popular and important means of communication, relied on by millions of Americans on a daily basis for personal and commercial purposes" and "offer[s] unique opportunities for the development and growth of frictionless commerce," § 7701(a)(1), and proceeding to set forth series of requirements aimed at unsolicited commercial electronic mail or "spam"); 18 U.S.C. § 2343(e)(1) (Contraband Cigarette Trafficking Act of 1978, as amended by 2006 renewal of Patriot Act) (defining "delivery sale" of cigarettes or smokeless tobacco, as to which certain information must

be maintained as required by U.S. Attorney General, to include sale in which "the consumer submits the order for such sale by means of a telephone or other method of voice transmission, the mails, *or the Internet or other online service*, or by any other means where the consumer is not in the same physical location as the seller when the purchase or offer of sale is made") (emphasis ours); 28 U.S.C. § 1920(2) (Judicial Administration and Technical Amendments Act of 2008) (including within taxable costs of litigation "[f]ees for printed *or electronically recorded* transcripts necessarily obtained for use in the case") (emphasis ours); 42 U.S.C. § 2000aa-7 (Privacy Protection Act of 1980) (defining "documentary materials" gathered in course of federal investigation, as to which statute sets forth certain privacy protections, to include "materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, mag[ne]tically, *or electronically recorded* cards, tapes, or discs . . .") (emphasis ours). In view of such statutory provisions, it is reasonable to expect that Congress would have used similar terminology had it meant to reach electronic receipts viewed or printed by the consumer. *Under Armour*, 593 F. Supp. 2d at 1287.

We recognize that section 1681c(g) was one of several provisions in FACTA that were enacted to combat identity theft. *See* Pub. L. 108-159, 117 Stat. 1952 (Dec. 4, 2003) (describing FACTA as "[a]n [a]ct [t]o amend the Fair Credit Reporting Act, *to prevent identity theft*, improve resolution of consumer disputes, improve the

accuracy of consumer records, make improvements in the use of, and consumer access to, credit information, and for other purposes") (emphasis ours). Applying FACTA's truncation requirements to electronic as well as printed receipts would no doubt be consistent with that purpose, *Active Network*, 2009 WL 2916838, at *2; *Best Buy*, 254 F.R.D. at 87; *1-800-Flowers*, 2008 WL 343179, at *3; *StubHub*, 2007 U.S. Dist. LEXIS 63719, at *8-*9, although as we note below, there are other statutes that address the integrity of electronic communications. But we may not ignore the unambiguous language of the statute in order to further Congress's expressed purpose in enacting the statute. *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2886 (2010) ("It is our function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve."); *see also*, *e.g.*, *Carr v. United States*, 130 S. Ct. 2229, 2241 (2010) (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261, 113 S. Ct. 2063, 2071(1993)). Both the language and context of the truncation requirement make plain that Congress was regulating only those receipts physically printed by the vendor at the point of the sale or transaction; to apply the statute to receipts that are emailed to the consumer would broaden the statute's reach beyond the words that Congress actually used.[3]

---

[3] We need not explore FACTA's legislative history in view of the unambiguous terms of the statute. *E.g.*, *Boyle v. United States*, 129 S. Ct. 2237, 2246-47 (2009). We do, however, note

(continued...)

Our construction of the statute does not produce absurd results. Although electronic receipts may also be misappropriated by identity thieves, one might reasonably believe that paper receipts pose unique, if not greater, dangers in that regard. A paper receipt produced at the point of sale or transaction may be dropped, mislaid, or discarded by the consumer in any number of public places where it easily can be retrieved and put to nefarious use by others. An electronic receipt, by contrast, to the extent it is viewed on the consumer's own computer or other digital device at a time and place of his choosing (including his home or office), is arguably less subject to inadvertent disclosure and theft. *Under Armour*, 593 F. Supp. 2d at 1288. To be sure, there may be someone looking over the consumer's shoulder when he views an email in a public place, and emails and other electronic data can be accessed without authorization ("hacked") at both the consumer's and the vendor's end of things. *See, e.g., Active Network*, 2009 WL 2916838, at *2. But Congress might have thought that the misappropriation of electronic data was better addressed by other statutory provisions that specifically deal with the privacy and misuse of such data. *See, e.g.,* 18 U.S.C. § 1028(c)(3)(A) (Identity Theft and Deterrence Act of 1998, as amended by Internet False Identification Prevention At of 2000) (criminalizing the knowing production, transfer, possession, use, or sale of stolen or forged iden-

---

[3] (...continued)

that neither party in this case nor any court addressing the reach of section 1681c(g)(1) has cited any legislative history that conflicts with our understanding of the statute.

tification documents in or affecting interstate or foreign commerce, "including the transfer of a document by electronic means"); 18 U.S.C. § 1030(a)(4) (Computer Fraud and Abuse Act of 1986) (criminalizing the unauthorized access of a computer owned by government or financial institution, or which is used in interstate or foreign commerce, with intent to defraud); 18 U.S.C. § 2511(1)(a) (Electronic Communications Privacy Act of 1986) (criminalizing unauthorized interception of electronic communications); 18 U.S.C. §§ 2701, 2707 (Stored Communications Act, enacted as part of Electronic Communications Privacy Act of 1986) (authorizing suit for damages by victim of unauthorized, intentional access to communications held in electronic storage).

Shlahtichman makes a belated argument that construing the truncation provision not to apply to email receipts is inconsistent with the FCRA's preemption provision, 15 U.S.C. § 1681t(b). That provision forecloses regulation by the States of any conduct regulated by the individual provisions of the statute, including the truncation provision. *See* § 1681t(b)(5)(A). Shlahtichman reasons that if email receipts are not covered by the federal statute, then States will be free to impose their own truncation requirements on email receipts, producing the very crazy quilt of State laws that FCRA's preemption provision was meant to avoid. But Shlahtichman forfeited this argument by failing to make it in the district court, *e.g.*, *Ocean Atlantic Dev. Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983, 1005 (7th Cir. 2003), and this is not one of the rare civil cases in which we might overlook the forfeiture, *see Russian Media Group, LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010).

We note finally that even if we have construed the statute too narrowly, dismissal of Shlahtichman's complaint was nevertheless appropriate because 1-800 Contacts did not willfully violate the statute. Shlahtichman has alleged no actual injury, *see* § 1681*o*(a)(1), and has instead sought the statutory damages that are authorized for willful violations of the truncation requirement, *see* § 1681n(a)(1)(A). Like this court, 1-800 Contacts has construed the truncation requirement not to apply to email receipts. To date, there has been no contrary opinion from a court of appeals or federal agency suggesting that the company's understanding of the statute is wrong; and even if its construction of the statute turns out to be mistaken, it is objectively reasonable nonetheless for all of the reasons we have discussed. Consequently, if 1-800 Contacts did violate the statute by including the expiration date of Shlahtichman's credit card in the receipt it emailed to him, it did not do so knowingly or recklessly. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 & n.20, 127 S. Ct. 2201, 2215-16 & n.20 (2007); *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1319 (11th Cir. 2009) ("*Safeco* makes clear that evidence of subjective bad faith cannot support 'a willfulness finding . . . when the company's reading of the statute is objectively reasonable'"); *Movietickets.com*, 555 F. Supp. 2d at 1342-43.

For all of these reasons, we AFFIRM the district court's judgment.