PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4504
_____

MARIE ANN FUGES,
on behalf of herself and all others similarly situated

v.

SOUTHWEST FINANCIAL SERVICES, LTD.

Marie Ann Fuges,
                              Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 09-cv-00699)
District Judge:  Hon. Legrome D. Davis
_____

Argued
September 25, 2012

Before:   McKEE, *Chief Judge*, JORDAN, and VANASKIE,
*Circuit Judges*.

(Filed: December 6, 2012)
_____

James A. Francis   [ARGUED]
Erin A. Novak
John Soumilas
Francis & Mailman
100 S. Broad Street – 19th Fl.
Philadelphia, PA   19110
        Counsel for Appellant

Darryl J. May    [ARGUED]
Mark J. Furletti
Ballard Spahr
1735 Market Street – 51st Fl.
Philadelphia, PA   19103
        Counsel for Appellee

Thomas M. Hanson
Dykema Gossett PLLC
1717 Main Street – Ste. 4000
Dallas, TX   75201
        Counsel for Not Party Amicus Consumer Data Industry
        Association

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Marie Ann Fuges appeals from an order of the United States District Court for the Eastern District of Pennsylvania entering summary judgment in favor of Southwest Financial Services, Ltd. ("Southwest") with respect to Fuges's claim that Southwest willfully violated the Fair Credit Reporting

Act ("FCRA"), 15 U.S.C. §§ 1681-1681x.  Fuges claims that Southwest willfully violated FCRA when it included inaccurate information in a report to Fuges's lender concerning potential encumbrances on her home.  Southwest argues in response that it is not a "consumer reporting agency" ("CRA") governed by FCRA, and that the statute does not apply to the report that it provided to Fuges's lender.  The District Court held that no reasonable jury could find that Southwest had willfully violated FCRA, because Southwest reasonably interpreted the statute as inapplicable to its activities and so, under the standard set forth in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), Southwest could not be liable as claimed.  For the following reasons, we will affirm.

## I.    Background

### A.    *Facts*

Southwest sells current owner title reports, otherwise known as property search or limited property reports ("property reports" or "reports") to consumer lenders.  The purpose of those reports is to confirm the identity of the current holder of title to the property and to determine whether the property is encumbered.  All of the information that Southwest collects is available in public records.

Southwest's reports include the name and address of the property owner, the marital status of the property owner (if it appears on the deed), the amounts of any outstanding mortgages, and the amounts of any outstanding liens or

3

judgments against the property.[1]  The property reports do not include the owner's social security number, payment history, previous addresses, employment information, date of birth, or outstanding account balances all of which would typically be included in a consumer credit report prepared by one of the "Big Three" credit reporting agencies (Equifax, Experian, and Trans Union).  Another point of distinction is that Southwest endeavors to include in its property reports only those judgment liens that remain unsatisfied at the time of the report, because only those liens encumber the property.  A typical credit report, by contrast, shows judgment liens that have been satisfied, because they are part of a consumer's payment history.

Marie Ann Fuges had a $35,000 line of credit from PNC Bank ("PNC"), which she secured with the home she owned in Philadelphia.  In 2008, she applied to PNC for payment protection insurance that would repay her line of credit in the event that she died or became disabled.  PNC told Fuges that, in order to obtain the insurance, she needed to reapply for her line of credit.[2]  She did so, and, after she

------

[1] Because the purpose of Southwest's property reports is to determine whether property to be used as collateral for a loan is encumbered, if a consumer seeks to secure a loan with collateral owned by a third party, the property report would only include information on that third party, not the consumer.  For approximately 80 percent of Southwest's Pennsylvania property reports, however, the loan applicant is also the owner of the subject property.

[2] Fuges also applied for a $5000 increase in the line of credit, even though that increase was not required in order for her to obtain the credit insurance.

4

submitted her loan application, PNC ordered a credit report generated by a credit reporting agency, as well as a property report on the home that she owned. Southwest prepared the latter and provided information concerning the ownership of the home that Fuges put up as collateral, as well as information on whether the property was subject to mortgages, judgment liens, unpaid taxes, or other encumbrances.

More specifically, that property report contained the following information: (1) Fuges's name and address; (2) a note concerning her marital status; (3) the amount of her mortgage ($35,000.00); (4) a reference to a $111.11 property tax delinquency; and (5) a reference to a $2,923.63 judgment lien filed by a merchant for a delinquency on the part of her son, Robert W. Fuges. The report was inaccurate in two respects. First, Fuges's property tax payments were arguably not delinquent because she had an agreement with the City of Philadelphia to pay her taxes in monthly installments. Second, the property report should not have reflected the judgment lien because inclusion of the lien wrongly assumed that the debt was owed by Fuges's deceased husband, Robert E. Fuges, who had been an owner of the property at one time.

After PNC received the Fuges property report, it informed Fuges that it could not approve her loan application without proof that she had paid her property taxes. Later, however, PNC provided Fuges with the credit insurance, leaving her existing line of credit in place.[3]

---

[3] It is unclear from the record when PNC changed its mind about the credit insurance, or for what reason. Fuges testified that she found out "by accident" (App. at 427) that

5

B.     *Procedural History*

On February 18, 2009, Fuges filed a putative class action against Southwest, alleging that Southwest failed to comply with FCRA in preparing the property report that it had provided to PNC in connection with her credit application.  She initially claimed damages for both willful and negligent violations of the statute under 15 U.S.C. §§ 1681n and 1681o, respectively.

On April 22, 2009, Southwest filed a motion to dismiss for failure to state a claim, arguing that Fuges had failed to take certain actions required under FCRA (such as contacting Southwest and asking for a copy of her property report) and also arguing that Fuges could not prove that the report caused PNC to deny her credit application.  On July 15, 2009, the District Court dismissed most of Fuges's claims because she had failed to take actions required by FCRA, but the Court granted Fuges leave to amend her complaint.  She then filed an amended complaint, and Southwest again filed a motion to dismiss, which the District Court denied.

On August 1, 2011, Southwest moved for summary judgment.  It argued that its reports are not subject to FCRA, and that, even if they were, it was not liable because it did not willfully violate FCRA under the standard articulated in *Safeco*, 551 U.S. at 69-70.[4]   Southwest also asserted that it

the bank had provided the credit insurance when she read her banking statement several months after she submitted her credit application, and PNC never notified her of its decision. PNC did not approve the increase in the line of credit.

[4] In *Safeco*, the Supreme Court held that "a company

6

could not be held liable for any negligent violation of FCRA because PNC ultimately gave Fuges the credit insurance for which she had applied, and she did not suffer any injury as a result of Southwest's conduct.[5]

On November 21, 2011, the District Court issued an opinion and order granting the motion for summary judgment. The Court did not address whether Southwest's conduct fell within the scope of FCRA, or whether there was evidence of FCRA violations. Rather, it determined that no reasonable jury could find that Southwest had acted willfully because Southwest's reading of FCRA as not being applicable to its

---

subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." 551 U.S. at 69. *See infra* Part II.B.

[5] Fuges testified that, initially, all she wanted from PNC was the credit insurance, but that "since [she] was reapplying, [she] just asked for the increase" in the credit line. (App. at 428.) According to the statement of undisputed facts that Southwest submitted in support of its motion for summary judgment, because "[s]he obtained this insurance even though her [credit] application was denied[,] ... [s]he explicitly testified that she suffered no damage other than the allegedly inaccurate information reported to PNC." (App. at 257.) In her brief in opposition to Southwest's motion for summary judgment, Fuges elected to pursue only her claim for willful violations and not to press her claim for negligent violations of FCRA.

7

business was not unreasonable. In particular, the Court said, "a reasonable jury could not conclude that Southwest *willfully*, i.e., *knowingly or recklessly*, violated ... FCRA, because Southwest reasonably interpreted its activities to fall outside the scope of the Act, in light of the less-than-clear statutory text and absence of meaningful judicial or FTC guidance." [6] (App. at 13.) In reaching that conclusion, the District Court reasoned that Southwest's interpretation of FCRA was "objectively reasonable" because the Fuges property report contained four sections – deeds, mortgages, parcel number and taxes, and lien information – that "more closely relate to a particular parcel of property than to a particular consumer." (App. at 10.) The Court also considered it significant that Southwest's report did not contain "Fuges'[s] social security number, payment history on various debts, or previous addresses, all of which one might expect to see on a typical credit report from a CRA." [7]

---

[6] The Federal Trade Commission ("FTC") has enforcement responsibility for certain FCRA provisions. *See Safeco*, 551 U.S. at 70.

[7] The District Court, like other courts, appears to have equated the term "consumer report," which is defined in FCRA, *see* 15 U.S.C. § 1681a(d)(1), with a "credit report," a term that is commonly understood to refer to a report like those prepared by one of the nationally recognized CRAs. *See also Cortez v. Trans Union, LLC*, 617 F.3d 688, 707 n.23 (3d Cir. 2010) ("We use 'consumer report' and 'credit report' interchangeably. The report referred to as a 'consumer report' in the statute is more commonly known as a 'credit report.'"). We note, however, that the two are not necessarily the same, as demonstrated by the fact that a report may constitute a "consumer report" when its purpose is not the

(*Id.*) Thus, it determined that "Southwest's reading of FCRA's CRA definition, i.e., that Southwest's reports are 'on properties' not 'on consumers,' and therefore Southwest is not a CRA, has a foundation in the statutory text, which suggests that Southwest acted reasonably, not recklessly, with respect to FCRA." (*Id.*)

Fuges filed a timely notice of appeal.

---

securing of credit or other financial services. *See* 15 U.S.C. § 1681a(d)(1)(B), (C) (providing that purpose may be eligibility for employment or other purposes set forth in § 1681b). Information other than credit data may also render a report a "consumer report" covered by FCRA. *See* 15 U.S.C. § 1681a(d)(1) (providing that "*any* information ... bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" constitutes a consumer report (emphasis added)).

## II.    Discussion[8]

### A.    *FCRA*

FCRA "require[s] that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information ... with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. § 1681(b).[9]  The statute imposes

---

[8] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.  We have jurisdiction under 28 U.S.C. § 1291.  "We exercise plenary review over the [D]istrict [C]ourt's grant of summary judgment, applying the same standard ... ."  *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010).  "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving person is entitled to a judgment as a matter of law."  *Celotex v. Catrett,* 477 U.S. 317, 322 (1986) (internal quotation marks omitted).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[9] The "reasonable procedures" required by FCRA include maintaining a system to provide fraud alerts to the consumer (15 U.S.C. § 1681c-1); maintaining an internal compliance system to ensure the accuracy of consumer information (*id.* § 1681e); providing disclosure of all information in a consumer's file on demand by the consumer (*id.* §§ 1681g, 1681h); and maintaining procedures to allow a

10

civil liability on "[a]ny person who ... fails to comply with any requirement imposed" by the statute. *See id.* §§ 1681n, 1681o. A person who negligently fails to comply is liable to the affected consumer for actual damages. *Id.* § 1681o(a)(1). A person who willfully fails to comply is liable to the affected consumer for actual damages, or statutory damages ranging from $100 to $1,000, as well as punitive damages and attorney's fees. *Id.* § 1681n(a).

The enactment of FCRA "was prompted by congressional concern over abuses in the credit reporting industry." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996) (internal quotation marks omitted). Congress wanted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco*, 551 U.S. at 52. In support of FCRA, Congress found that

> [a]n elaborate mechanism [had] been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers[;] [] [that] [c]onsumer reporting agencies [had] assumed a vital role in assembling and evaluating consumer credit and other information on consumers; [and that] [] [t]here [was] a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

consumer to dispute and to correct inaccurate information (*id.* § 1681i).

11

15 U.S.C. §1681(a).

FCRA only applies to CRAs. The statute defines a "consumer reporting agency" as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer[10] credit information or other information on consumers for the purpose of furnishing consumer reports to third parties … ." *Id.* § 1681a(f).

Moreover, for a report to be covered by FCRA, it must be a "consumer report," defined as

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for –
>
> > (A) credit or insurance to be used primarily for personal, family, or household purposes;
> > (B) employment purposes; or
> > (C) any other purpose authorized under section 1681b of this title.

---

[10] FCRA defines "consumer" as "an individual." 15 U.S.C. § 1681a(c).

12

*Id.* § 1681a(d)(1).[11]

Taken together, these definitions establish statutory markers against which the reasonableness of any reading of the applicability of FCRA must be measured. One marker is that, for the preparer of a report to qualify as a CRA, the preparer must regularly engage in gathering information "on consumers" with the purpose of preparing and furnishing "consumer reports." Another marker is that, for a report to be subject to FCRA, it must both be a "consumer report" and have been prepared by a "consumer reporting agency," as those terms are defined in the statute.

---

[11] The defined term "consumer report" is subject to a number of statutory exclusions. These include: reports containing information relating solely to transactions or experiences between the consumer and the person making the report or communications between commonly-controlled or affiliated parties, 15 U.S.C. § 1681a(d)(2)(A); notifications of the extension of credit by credit card companies, *id.* § 1681a(d)(2)(B); and reports containing the decision of a person who has been requested by a third party to extend credit to a consumer, provided that the consumer is informed of the request for the report, *id.* §1681a(d)(2)(C). Communications relating to prospective employment, including investigative reports, are also excluded. *Id.* § 1681a(d)(2)(D), 1681a(o), 1681a(y). FCRA does not specifically except "property reports" or any similar reports from the definition of "consumer reports," and we neither express nor imply any opinion on whether property reports of the kind at issue here are covered by FCRA.

13

B.     *Liability Standard Under* Safeco

The Supreme Court's landmark decision in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), set the framework that the District Court here relied on in granting summary judgment to Southwest.  *Safeco* involved insurance companies that relied in part on credit scores to set auto insurance premiums.  Because of unfavorable credit scores, some new applicants were quoted insurance rates that were higher than the best rates available.  The applicants argued that they had been subjected to an "increase" in rates (even though they had not previously enjoyed the lower rates) and so had suffered "adverse action" based on their credit reports, which required notice under § 1681m(a) of FCRA.  *Id.* at 54-55.  The insurance companies argued that they did not have to comply with FCRA's notice requirement because the failure to offer the preferred rates to new customers could not constitute an "increase" in rates in the absence of prior dealing.  *See id.* at 69.  The plaintiffs sought statutory and punitive damages, which required that they prove that the failure to give notice was "willful."  The Supreme Court held that it was not.  Although the Court disagreed with the insurance companies' interpretation of "increase," it concluded that the interpretation was "*not objectively unreasonable*, and so falls well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability."  *Id.* at 70 (emphasis added).  The Court thus established a safe harbor against liability for willfulness. A company cannot be said to have willfully violated FCRA if the company acted on a reasonable interpretation of FCRA's coverage.

14

The Court derived this "reasonable interpretation" test by deconstructing the word "willfully." FCRA imposes civil liability where the defendant "willfully fails to comply" with the statute. 15 U.S.C. § 1681n(a).[12] The Court noted, however, that "'willfully' is a word of many meanings" and that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco*, 551 U.S. at 57 (citations and internal quotation marks omitted). Drawing on the "essence of recklessness at common law," the Court said that "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69 (internal quotation marks omitted). A defendant's conduct is reckless only if it was "objectively unreasonable" in light of "legal rules that were 'clearly established' at the time." *Id.* at 69-70 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Thus, even when a court disagrees with a party's reading of FCRA, it may not impose liability for a reckless, and therefore willful, violation of the statute unless that party's reading is "objectively unreasonable." *See id.* at 69 (noting that the Court did not agree with Safeco's analysis and that its reading of FCRA was "erroneous").[13]

---

[12] FCRA also imposes liability for negligent violations. 15 U.S.C. § 1681o. However, Fuges elected to pursue only her claim for willful violations and not to press her negligence claim.

[13] Although the analysis that yielded the *Safeco* "reasonable interpretation" test followed from the common

In short, the *Safeco* test is one of "objective reasonableness," and the Court explicitly rejected the argument that subjective bad faith must be taken into account in determining whether a defendant has acted recklessly, and therefore willfully, under FCRA. In deciding that subjective bad faith is irrelevant, the Court said that, "[w]here … the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco*, 551 U.S. at 70 n.20.

Fuges argues in this appeal that Southwest is not entitled to the *Safeco* "reasonable interpretation" defense, both because Southwest had not actually interpreted FCRA

---

law definition of recklessness, knowing noncompliance also, of course, constitutes a willful FCRA violation. *See Safeco*, 551 U.S. at 57; *see also Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3d Cir. 1997) (acknowledging that an investigative policy could constitute a willful FCRA violation if adopted either "knowing that policy to be in contravention of the rights possessed by consumers pursuant to ... FCRA or in reckless disregard of whether the policy contravened those rights"). Fuges suggests that this may represent an alternative basis on which we may find willful violations on the part of Southwest. (*See* Appellant's Opening Br. at 26 (noting that "recklessness is not the only way for a plaintiff to prove an [sic] FCRA violation was willful" and that "knowing noncompliance may *also* constitute a willful FCRA violation").) However, the record contains no evidence that Southwest knew that it was in violation of FCRA, and Fuges did not make that argument in the District Court.

before concluding the statute did not apply to its activities and because Southwest's interpretation of FCRA was not objectively reasonable.[14] We take each of those arguments in turn.

### C. Safeco*'s Applicability Absent a "Reading" of FCRA*

Fuges contends that the District Court erred by extending the "reasonable reading" defense articulated in *Safeco* to Southwest's conduct even though Southwest failed

---

[14] Fuges also argues that the District Court erred at the summary judgment stage by failing to consider evidence that Southwest's activities come within the ambit of FCRA, and that the District Court was required to consider evidence of willful violations prior to concluding that Southwest was, under *Safeco*, free from liability for such violations. We disagree. Evidence of knowing violations of FCRA is relevant to a claim of willfulness, *see supra* note 13, but then *Safeco*'s recklessness analysis would not apply. *See Safeco*, 551 U.S. at 56-57 (noting that knowing violations of FCRA are willful by definition.) When a plaintiff does not allege knowing violations of FCRA, however, the claim must be based on recklessness and *Safeco*'s "reasonable interpretation" test applies. In those "recklessness" cases, whether a defendant has actually violated FCRA is simply not the issue. *See id.* at 68 (noting that, even "if Safeco did violate the statute, the company was not reckless in falling down in its duty"); *id.* at 69 (noting that "Safeco's reading of the statute, albeit erroneous, was not objectively unreasonable"); *id.* at 70 ("Safeco's misreading of the statute was not reckless.").

17

to read or interpret FCRA in the first instance. The District Court focused its analysis on the interpretation of the terms "consumer reporting agency" and "consumer report." (*See* App. at 9 (discussing components of the CRA definition in 15 U.S.C. § 1681a(f)).) The Court did not specifically address the question of whether Southwest had adopted a particular interpretation of those terms prior to preparing the Fuges property report or prior to the commencement of this lawsuit.

The timing, however, is not dispositive. In *Long v. Tommy Hilfiger U.S.A.*, 671 F.3d 371 (3d Cir. 2012), we expressly rejected the argument that a defendant is required to have a pre-litigation "reading" of FCRA to avail itself of the *Safeco* "reasonable interpretation" defense. 671 F.3d at 377. *Long* involved the interpretation of the phrase "expiration date" in a FCRA provision governing the disclosure of credit card information. Like Fuges, the plaintiff in *Long* argued that the defendant "did not actually rely on *any* interpretation of [FCRA] and instead disregarded the statute altogether and is only now seizing upon a *post hoc* 'objectively reasonable' interpretation in order to shield itself from liability." *Id.* (citation and internal quotation marks omitted). That argument struck us as being, in essence, an assertion about the defendant's intent or subjective bad faith, and, as such, it was "expressly foreclosed by *Safeco*," because such evidence "is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question." *Id.* (citing *Safeco*, 551 U.S. at 70 n.20).

Fuges argues that *Long* and other cases in which defendants were found to have relied on a reasonable interpretation of FCRA may be distinguished from two post-*Safeco* cases in which there was "no evidence whatsoever of a

18

[FCRA] 'reading' by the defendant," and in which the *Safeco* defense did not apply. (*See* Appellant's Opening Br. at 40 (citing *Birmingham v. Experian Info. Solutions, Inc.*, 633 F.3d 1006 (10th Cir. 2011); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008)).) However, in neither of those cases was the interpretation of specific FCRA terms at issue.[15]

Fuges also notes that in most of the post-*Safeco* cases, such as *Long*, *Shlatichman v. 1-800-Contacts, Inc.*, 615 F.3d 794 (7th Cir. 2010), and *Levine v. World Financial Network National Bank*, 554 F.3d 1314 (11th Cir. 2009), the "defendants acknowledged ... FCRA's regulatory existence, and attempted to comply with it on some level." (Appellant's Opening Br. at 40.) However, in each of those cases, the defendant also acknowledged that it was subject to FCRA, and the only disputed issue was the interpretation or

---

[15] The dispute in *Birmingham* was whether a CRA had willfully violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the accuracy of its consumer reports, and whether it had violated 15 U.S.C. § 1681i(a) because it did not adequately address a consumer's concerns about the accuracy of his credit file. *See Birmingham*, 633 F.3d at 1009. However, the defendant's reading of the relevant FCRA provisions was not at issue. The *Saunders* court did not apply the *Safeco* "reasonable interpretation" test because a jury had already found willful FCRA violations based on a pre-*Safeco* instruction that the defendant had to have acted "knowingly and intentionally." *See Saunders*, 526 F.3d at 151 & n.4 (noting that the jury instruction had placed a greater burden on the plaintiff than the *Safeco* test, and that he had met that burden).

19

applicability of a particular provision of FCRA. In the present case, based on its interpretation of the definitions of "consumer report" and "consumer reporting agency," Southwest has urged that it is not subject to FCRA at all.

In summary, Southwest does not lose the potential protection of the "reasonable interpretation" defense, even if it never actually interpreted FCRA prior to the commencement of this lawsuit. *Safeco* requires only that "the company's reading of the statute *is* objectively reasonable," *Safeco*, 551 U.S. at 70 n.20 (emphasis added), and that the interpretation that would allow the conduct in question is "an interpretation that could reasonably have found support in the courts," *id*. *Safeco* does not require that the defendant actually have made such an interpretation at any particular point in time.

## D. *Southwest's Liability Under the* Safeco *Test*

Fuges argues in the alternative that, even if Southwest is potentially entitled to shelter in *Safeco*'s safe harbor, the District Court erred in holding that no reasonable jury could find that Southwest had acted recklessly, and therefore willfully, in treating FCRA as inapplicable.[16] Fuges contends

---

[16] At the outset of her treatment of this issue, Fuges suggests that "no court has ever found that it is jury question whether a defendant had an objectively reasonable *reading* of FCRA statutory text" because "[j]uries focus on facts, not [on] the interpretation of statutory text, particularly ambiguous statutory text." (Appellant's Opening Br. at 50.) However, Fuges misapprehends the District Court in this regard. The District Court held only that a reasonable jury

20

that neither Southwest nor the District Court specifically identified any ambiguity in the statutory text,[17] and that any reading of FCRA as being inapplicable must be reckless.

_____

could not find that Southwest had acted recklessly, and therefore willfully, based on the Court's own determination that the FCRA definitions of "consumer reporting agency" and "consumer report" were ambiguous, and that Southwest's interpretation was not objectively unreasonable. (*See* App. at 13 (emphasizing the "narrow scope of [the Court's] decision").) After *Safeco*, a jury may be called on to determine whether violations of FCRA were willful or negligent, based on the facts surrounding defendants' adoption of a particular reading of the statute. *See Cortez*, 617 F.3d at 722 (considering the "jury's reasoned determination" that the defendant was "not merely careless" in determining that FCRA did not apply); *see also id.* (noting that "the verdict of this lay jury reveals an understanding of the distinction between negligent and willful"); *id.* at 723 (speculating that "[t]he jury may well have concluded" that the defendant deliberately risked violating FCRA because the offending consumer information "was a separate product that could be sold to customers at an additional cost").

[17] Fuges's argument misses the mark. She takes pains to demonstrate that the text of the specific FCRA provisions for which she alleges violations (15 U.S.C. §§ 1681e(a), (b), (c), (d), 1681h(c)) is unambiguous, and that courts of appeals (including this Court) have already construed those provisions. However, it was only the definitions of "consumer report" and "consumer reporting agency" in 15 U.S.C. § 1681a(d), (f) that the District Court concluded were unclear. (*See* App. at 12-13 (noting that these definitions add

To understand why Fuges is mistaken, it is helpful to consider why the "reasonable interpretation" test was met in *Safeco*. We noted in *Long* that there were three bases for the Supreme Court's decision in *Safeco*. First, FCRA gave no clear guidance on whether the auto insurers were required to view an initial rate offer as an "increase" in rates that would constitute adverse action and trigger a consumer notification requirement. *Long*, 671 F.3d at 376 (citing *Safeco*, 551 U.S. at 69-70).[18] Second, the insurers' proposed interpretation that their quotes were not an adverse action "had a 'foundation in the statutory text ... and a sufficiently convincing justification to have persuaded the District Court to adopt it.'" *Id.* (quoting *Safeco*, 551 U.S. at 69-70) (omission in original). And third, the insurers were interpreting the statute in the absence of any contrary authority on the meaning of "increase" because "'no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC.'" *Id.* (quoting *Safeco*, 551 U.S. at 70).

The District Court here was satisfied that conditions similar to those that had rendered Safeco's reading of FCRA "not objectively unreasonable" were present in this case. First, the Court decided that the statutory definitions of "consumer reporting agency" and "consumer report" were ambiguous as applied to "a company like Southwest that sells so-called 'current owner reports.'" (App. at 10.) Second, the Court determined that Southwest's reading of FCRA's CRA

_____

"an additional layer of interpretive complexity," as applied to Southwest, not found in other FCRA cases).)

[18] The *Safeco* Court characterized the statutory text as "less-than-pellucid." *Safeco*, 551 U.S. at 70.

22

definition as not covering Southwest "has a foundation in the statutory text."[19] (*Id.*) Third, the Court found "an absolute dearth of judicial or agency guidance regarding whether ... FCRA" covers the activities of Southwest. (*Id.* at 11.) The District Court thus concluded that Southwest did not act recklessly with respect to FCRA.

We agree with the District Court's analysis. First, the FCRA definitions of "consumer reporting agency" and "consumer report" are ambiguous as they relate to Southwest. The source of this ambiguity is the phrase "information on consumers" in the CRA definition, and the phrase "bearing on a consumer[ ]" in the definition of consumer report. Fuges argues, in essence, that any information in the Southwest property report that relates to her is information "on" or "bearing on" her as a consumer. But to take this argument to its limits, virtually any information gathered in connection with a consumer lending transaction can be characterized as information on, or bearing on, the individual applicant because it says something related to the applicant. Thus, the unbounded nature of these definitions renders them ambiguous when one tries to figure out just how broadly a sensible definition should reach.

---

[19] The District Court focused on the requirement that an entity "assemble or evaluate '*consumer credit information* or other information *on consumers*'" to be covered by the FCRA definition of "consumer reporting agency." (App. at 9 (quoting 15 U.S.C. § 1681a(f)).) The Court concluded that Southwest's reading of that language to exclude it from coverage as a CRA, "because it reports on properties, not consumers," *id.*, was not objectively unreasonable.

Second, Southwest's reading of the applicable provisions of FCRA has some foundation in the statutory text, and was therefore not objectively unreasonable. The definition of a CRA requires that a company "engage[ ] in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers." 15 U.S.C. § 1681a(f). Southwest could reasonably interpret that provision to exclude information that it assembles with regard to a subject property, because such information is not "on consumers." Likewise, the definition of "consumer report" encompasses only reports that contain "information [assembled] by a [CRA] bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d)(1). Southwest could reasonably interpret that provision to exclude its property reports, both because it interpreted the CRA definition to exclude itself,[20] and because the information on property

---

[20] This case differs from other post-*Safeco* cases where the defendants claimed the *Safeco* defense for alleged willful violations of FCRA. In those cases, the defendant was indisputably a CRA, and the issue was whether the challenged conduct constituted a willful violation of a particular FCRA provision because the defendant had unreasonably interpreted that provision. *See, e.g.*, *Birmingham*, 633 F.3d at 1009 (considering whether a CRA had "reasonable procedures" to assure accuracy as required by 15 U.S.C. § 1681e(b)); *Levine*, 554 F.3d at 1318-19 (considering whether a CRA had complied with requirement for sale of consumer report for "account review" pursuant to 15 U.S.C. § 1681b(a)(3)); *Shannon v. Equifax Info. Servs., LLC*, 764 F. Supp. 2d 714 (E.D. Pa. 2011) (considering

24

encumbrances does not necessarily "bear on" any of the characteristics of an individual consumer's personal creditworthiness listed in that provision.

Third, there is no judicial or agency guidance that would suggest that Southwest's reading of FCRA is contrary to the intended meaning of the provisions in question.[21] Under *Safeco*, the inquiry is whether "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." 551 U.S. at 69; *see also Cortez v. Trans Union, LLC*, 617 F.3d 688, 723 (3d Cir. 2010) (finding recklessness where defendant "substantially risked acting in violation of [FCRA]"). The District Court correctly determined that Southwest was not

---

whether a CRA had "reasonable procedures" and conducted an investigation of allegedly inaccurate information as required by 15 U.S.C. §§ 1681e(b), 1681i(a), respectively). In this case, as the District Court noted, "Southwest disputed not only that its current owner reports fall within ... FCRA's definition of 'consumer reports,' but also that it even qualifies as a 'consumer reporting agency' in the first place." (App. at A12 (noting that "[t]his adds an additional layer of interpretive complexity").)

[21] While the absence of contrary authority to a particular FCRA interpretation is persuasive as to the reasonableness of the adoption of that interpretation, it is not dispositive. "It merely establishes that the issue has not been presented to a court of appeals before. The credit agency whose conduct is first examined under that section of the [FCRA] should not receive a pass because the issue has never been decided." *Cortez*, 617 F.3d at 722.

25

reckless because Southwest did not run a "substantial risk" in adopting its interpretation of FCRA, in the absence of authority contrary to that interpretation.  As the District Court noted, there does not appear to be any judicial or agency guidance as to whether FCRA covers companies like Southwest.  Cases concerning the CRA status of companies that are not credit bureaus but that still assemble "information on consumers" have typically addressed employee background investigatory reports that have little in common with the property reports at issue here.  *See, e.g.*, *Poore v. Sterling Testing Sys.*, 410 F. Supp. 2d 557 (E.D. Ky. 2006) (holding that a company that reports on criminal records of job applicants is a CRA);  *Lewis v. Ohio Prof'l Elec. Network, LLC*, 190 F. Supp. 2d 1049 (S.D. Ohio 2002) (same).  Moreover, those companies qualify as CRAs under part of the FCRA "consumer report" definition that specifically addresses employment eligibility reports.  *See* 15 U.S.C. § 1681a(d)(1)(B).  Unlike Southwest, companies that assemble such reports indisputably assemble "information on consumers," namely the employment candidates who are the subject of the reports.[22]

---

[22] FTC guidance on FCRA coverage is similarly scant. FTC guidance letters, like the judicial opinions noted above, are largely limited to employment eligibility reports.  *See, e.g.*, FTC Staff Opinion 9-15-99 (addressing CRA status of law firm that researches criminal records of job applicants for its clients);  FTC Staff Opinion 9-9-98 (addressing CRA status of company that provides information on prospective employees to fast food companies).  *See also* Letter from Federal Trade Commission to Richard LeBlanc, Due Diligence, Inc. (June 9, 1998), *available at* http://www.ftc.gov/os/ statutes/fcra/ leblanc.shtm (confirming

The District Court's ably stated conclusion that Southwest cannot be held liable for willful violations of FCRA is consistent with our holding in *Long* and finds support in numerous other cases in which courts have applied *Safeco* and declined to hold defendants liable absent evidence of a reckless approach to FCRA compliance. *See, e.g.*, *Long*, 671 F.3d at 377-78 (finding no liability for willful FCRA violations despite the fact that the court rejected the defendant's interpretation of the statute); *Birmingham*, 633 F.3d at 1009 (finding no liability "because of the absence of evidence of intentional or reckless misconduct"); *Levine*, 554 F.3d at 1318-19 (finding no liability where defendant reasonably interpreted "account" as including a "closed account"). [23]

---

that company that performs background checks and assembles and sells reports containing the information is a CRA). Even if there were FTC staff letters that address the applicability of FCRA to companies like Southwest, "the Supreme Court has expressly declined to describe such letters as 'authoritative guidance.'" *Levine*, 554 F.3d at 1319 (citing *Safeco*, 551 U.S. at 70 n.19).

[23] Fuges principally relies on *Cortez*, *supra*, in support of her argument that Southwest acted recklessly in adopting its interpretation of FCRA. *Cortez* is, however, readily distinguishable from the present case in that the defendant's interpretation there was in direct opposition to published authority on the applicability of FCRA. In *Cortez*, the offending information was an erroneous notation in a consumer report that the plaintiff was on a Treasury Department list of terrorists and drug traffickers ineligible for credit. *See Cortez*, 617 F.3d at 704-05. The defendant claimed that the information did not "bear on" the consumer's

In summary, Southwest's interpretation of the FCRA definitions of "consumer reporting agency" and "consumer report" is not unreasonable, and Southwest "did not run 'a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Long*, 671 F.3d at 378 (quoting *Safeco*, 551 U.S. at 69). Fuges therefore has not stated a claim for a willful violation of FCRA.[24]

creditworthiness, and that it was therefore not subject to FCRA. However, Treasury Department regulations explicitly stated that information regarding a consumer's inclusion on the terrorist watch list was governed by FCRA when included in a consumer report. *Id.* at 722. Moreover, a Treasury Department website notified consumers that both FCRA and FTC regulations provided them with a remedy against a CRA that furnished incorrect information about their presence on the watch list. *Id.* Given this explicit contrary guidance, we concluded that the defendant "substantially risked acting in violation of the law," as it adopted an interpretation of FCRA that was objectively unreasonable. *Id.* at 723; *see also id.* at 721 ("[T]he fact that [a defendant's] actions rest upon a legal conclusion does not immunize it from liability for reckless conduct under ... FCRA.") In the absence of the sort of contrary guidance present in *Cortez*, we cannot say that Southwest was similarly reckless in believing that its activities are not covered by FCRA.

[24] Like the District Court, we "need not, and do not, decide whether Southwest's business model, including its ... report on Fuges, falls within ... FCRA's sphere." (App. at 13.) Because we have concluded that Southwest did not willfully violate FCRA, and because Fuges chose not to pursue her claim for negligent violations of the statute, *see*

## III. Conclusion

For the reasons stated above, we will affirm the judgment of the District Court.

---

*supra* note 5, there is no sound reason to answer in this case whether Southwest negligently violated FCRA.