PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 07-1397

———————

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALLEGHENY HEALTH,
EDUCATION AND RESEARCH FOUNDATION,
                                        Appellant

v.

PRICEWATERHOUSECOOPERS, LLP

———————

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 00-cv-00684)
District Judge: Honorable David Stewart Cercone

———————

Argued April 15, 2008

———————

Before: AMBRO, JORDAN, and MICHEL,[*] <u>Circuit Judges</u>

(Filed: May 28, 2010)

Beth Heifetz, Esquire
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-0000

James M. Jones, Esquire
Jones Day
500 Grant Street, 31st Floor
Pittsburgh, PA   15219-0000

Patrick F. McCartan, Esquire (Argued)
Richard B. Whitney, Esquire
Jones Day
901 Lakeside Avenue, North Point
Cleveland, OH   44114-0000

   *Counsel for Appellant*

Joseph F. McDonough, Esquire
Manion, McDonough & Lucas
600 Grant Street, Suite 1414
Pittsburgh, PA   15219-0000

---

[*]Honorable Paul R. Michel, Chief Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

Thomas G. Rafferty, Esquire (Argued)
Antony L. Ryan, Esquire
Cravath, Swaine & Moore
825 Eighth Avenue, Worldwide Plaza
New York, NY   10019-0000

   *Counsel for Appellee*

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

We deal with a much-debated question of Pennsylvania law—if a third party (here, an auditor) colludes with agents to defraud their principal, do we impute to the principal the agents' misconduct and, if so, does that preclude recovery by another standing in the principal's place? With the benefit of a much-appreciated clarifying opinion from the Supreme Court of Pennsylvania, we now hold that Pennsylvania law requires an inquiry into whether the third party dealt with the principal in good faith. Because the District Court did not have the benefit of this clarifying opinion and did not conduct such an inquiry, we remand for further proceedings.

## I.    Facts and Procedural Background

### A.    The Debtor's Growth

3

The debtor is the Allegheny Health, Education, and Research Foundation ("AHERF"), a Pennsylvania non-profit corporation that, prior to its liquidation, provided a wide range of healthcare services, including operating hundreds of physicians' practices, 14 hospitals, and two medical schools.

From the mid-1980s, AHERF, under the leadership of CEO Sherif Abdelhak, tried to build a region-wide "integrated delivery system" through an aggressive program of acquisitions. According to the then-popular theory, a health system could make money by building a network of hospitals, physician practices, and medical schools. The schools would staff the hospitals with residents; the physician practices would, through referrals, provide the hospitals with patients; and the hospitals would bring in substantial net income through the provision of high-dollar specialty care. Industry publications and news articles from the 1990s discussing the integrated-delivery-system model indicate that it was, at least for a time, the business model *du jour* for large healthcare providers.[1]

---

[1] *See, e.g.*, Rhonda L. Rundle, *The Great Divide: A Tale of Two Doctors: One Who Embraces Managed Care, the Other Who Assails It*, Wall St. J., Oct. 26, 1997, at R11; Benjamin S. Snyder, *Future Lies in Managed Care*, San Jose Mercury News, Sept. 7, 1997, at 7P; George H. Pink & Tom Closson, *An Affordable Health-Care Delivery System that Works*, Toronto Star, Sept. 26, 1996, at A27; Robert Pear, *Budget Cuts Stall Broader Services in Medicare Plan*, N.Y. Times, Nov. 26, 1995, at A1 ("[H]ealth care providers are branching out into new

AHERF pursued the integrated-delivery-system model by acquiring hospitals and physician practices. When acquired, these entities generally were losing money. The hospitals, some thought, could be rehabilitated through better management, operational efficiencies, price reductions from mass contracts with vendors, and other economies of scale. The physician practices, on the other hand, would perform better, but would primarily serve as "loss leaders" to generate patients for the hospitals' high-dollar specialist care.

AHERF's implementation of the integrated-delivery-system model failed. By 1996, the company was suffering substantial operating losses. Cost savings and efficiency gains were not being realized, and cash was running out.

**B.      PwC's 1996 and 1997 Audits of AHERF**

---

areas, so one company can serve all of a patient's medical needs from birth to death. Health care executives say such full-service arrangements, known as integrated delivery systems, are good for patients and good for the company's bottom line."); Suzanne White & Richard Lamm, *Adam Smith Reshapes Colorado's Health Care*, Denver Post, Nov. 11, 1997, at B-07; George Anders & Rhonda L. Rundle, *As Wellpoint Spinoff Attracts Interest, Other Blue Cross Plans Consider Moves*, Wall St. J., Feb. 16, 1995, at A3 (Blue Cross executive describes building integrated delivery systems as "what everyone else in health care is doing").

AHERF had for some time employed the services of Coopers and Lybrand, now PricewaterhouseCoopers, LLP ("PwC"), to audit its financial statements. Specifically, PwC was engaged to provide an opinion on AHERF's financial statements to its board of trustees. PwC could either provide a "clean" opinion, which would indicate that the statements were accurate and complied with generally accepted accounting principles ("GAAP") and generally accepted auditing standards ("GAAS"), or an "adverse" opinion, which would identify deficiencies in the statements.

A group of high-level AHERF officers, led by David McConnell (AHERF's chief financial officer) and operating with Abdelhak's approval, is alleged to have knowingly misstated AHERF's finances in the figures they provided PwC for the 1996 audit of AHERF. These misstatements were designed to conceal how precarious AHERF's financial position was, and to make it look as though the integrated-delivery-system model was beginning to pay dividends in the form of cost savings and increased net income. As alleged by the Official Committee of Unsecured Creditors (the "Committee"), standing in the shoes of AHERF, PwC's audit should have brought these misstatements to light, but, rather than issuing an adverse opinion as GAAP and GAAS required, PwC knowingly assisted in the officers' misconduct by issuing a "clean" opinion. According to the Committee, the officers and PwC repeated this misconduct in 1997.

The result of these misdeeds, according to the

6

Committee, was that the AHERF board was under the false impression that the company was in relatively good financial shape. Thus, the board did not intervene in management's business strategy, and instead allowed Abdelhak to continue making acquisitions.

## C. Bankruptcy

By the spring of 1998, Abdelhak and McConnell were unable to prevent board members from perceiving that AHERF's financial position was dire. Suppliers began complaining directly to board members about not being paid, and doctors threatened to quit over Allegheny General Hospital's lack of resources. As AHERF's financial condition leaked out, board members became less confident in Abdelhak's leadership, and in early June 1998 they removed him as President and CEO. They also removed McConnell as CFO. Soon thereafter, they terminated PwC and issued warnings that their 1997 financial statements were not reliable.

AHERF's corrective measures came too late, and in July 1998 it filed for relief under Chapter 11 of the Bankruptcy Code.

## D. This Action

In this adversary proceeding, the Committee, on behalf of AHERF, asserted three causes of action against PwC: (1) breach of contract, (2) professional negligence, and (3) aiding and abetting a breach of fiduciary duty. PwC moved for

7

summary judgment on numerous grounds.

On January 17, 2007, the District Court granted summary judgment in favor of PwC. *Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP* (*Allegheny I*), No. 2:00cv684, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007). Although PwC asserted seven arguments in favor of granting summary judgment to it, the District Court granted it on the sole ground that AHERF was *in pari delicto*[2] with PwC, and thus the

---

[2] *In pari delicto* is an ill-defined group of doctrines that prevents courts from finding for a plaintiff equally at fault as the defendant. *See Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 453–54 (7th Cir. 1982) (Posner, J.) (identifying multiple doctrines that embody a common principle and often apply in similar ways across various causes of action); *see also Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354–55 (3d Cir. 2001) ("We nevertheless can legitimately speak of one doctrine, *in pari delicto*, across the different claims because the analysis under various causes of action will typically be the same."). It is a murky area of the law, and courts in Pennsylvania have not been of one mind as to whether the doctrine is legal or equitable. *Compare Sacco v. Twp. of Butler*, 863 A.2d 611, 615 n.3 (Pa. Commw. Ct. 2004) (referring to doctrine as "equitable") *with Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 458 A.2d 545, 548 (Pa. Super. Ct. 1983) (referring to the "common-law" doctrine of *in pari delicto*). Because it was not clear from the few Pennsylvania cases invoking it how the doctrine applied to the

Committee could not recover. Put another way, the Court found that the wrongdoing of AHERF's senior management must be imputed to AHERF, and that the doctrine of *in pari delicto* applies to bar the Committee's claims, as AHERF was at least as much at fault as PwC. *Id.* at *6.

On the issue of imputation, the District Court looked to our decision in *Lafferty*, *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001), and applied a two-part test to determine whether fraud of an officer is imputed to a corporation. It found both prongs (course of employment and benefit to the corporation) satisfied and imputed the officers' conduct to AHERF. *Allegheny I*, 2007 WL 141059, at *9–13. In particular, it set a low bar for benefit to the corporation: "the question is a relatively simple one—whether *any* benefit accrued to AHERF." *Id.* at *10 (emphasis in original). Although it noted that there were "many factual issues that are disputed," the District Court determined that "AHERF management was acting within the scope of their employment in submitting the [false] financial statements and that such misconduct enabled further acquisitions that, in the short term, was a benefit to AHERF." *Id.* at *11.

On the issue of *in pari delicto*, the District Court found that even though the auditor was alleged to have improperly

causes of action at issue here, we submitted certified questions to the Supreme Court of Pennsylvania.

9

colluded with management, the "mutual fault" of the corporation (as a result of imputation) barred its (and thereby, the Committee's) claims. *Id.* at *13. The Court also rejected the "innocent and independent decision-maker" argument[3] adopted by some courts to bar *in pari delicto* defenses in the auditor-liability context. *Id.* at *14.

This timely appeal followed.

### E. Certification to the Supreme Court of Pennsylvania

Although we normally resolve issues of state law without certifying questions to a state Supreme Court, this case includes a dimension not previously considered in the Pennsylvania cases cited to us. After reading the briefs and submissions of the parties, hearing oral argument, and reviewing applicable Pennsylvania law, we certified two questions to the Supreme Court of Pennsylvania to clarify important and unresolved

---

[3] The District Court looked to cases holding that "innocent and independent" Board members of a corporation could have, if so informed, stopped the wrongdoing. Those cases thereby barred *in pari delicto* defenses against a bankruptcy trustee seeking to recover against outside professionals. *See Allegheny I*, 2007 WL 141059, at *14 (*citing In re Sharp Int'l Corp.*, 278 B.R. 28, 36 (Bankr. E.D.N.Y. 2002), and *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 (S.D.N.Y. 1997)).

10

questions concerning the interaction between the *in pari delicto* doctrine and the imputation of an agent's fraud to his principal under Pennsylvania law. *Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP* (*Allegheny II*), No. 07-1397, 2008 WL 3895559, at *6 (3d Cir. July 1, 2008).

The Pennsylvania Supreme Court unanimously answered the certified questions and returned the matter to us. *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP* (*Allegheny III*), 989 A.2d 313 (Pa. 2010). It conducted a comprehensive analysis of the certified questions, for which we are most grateful, and we proceed with the benefit of that opinion.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). We have jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over an appeal from a grant of summary judgment. *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

## III.    Discussion

11

As we discussed in the certification request, the District Court's grant of summary judgment rests on two holdings. First, the Court imputed to AHERF its officers' fraud in misstating the company's finances to the corporation. Second, it held that the doctrine of *in pari delicto* prevents AHERF (and thereby the Committee standing in its shoes) from recovering against PwC because, even were PwC in collusion with the officers, the latter were joint fraudfeasors whose conduct was imputed to AHERF. However, the District Court did not have the benefit of *Allegheny III* when it considered Pennsylvania law, and it did not consider whether imputation and *in pari delicto* were appropriate under the Supreme Court of Pennsylvania's "good faith" test discussed below. In that context, this case requires further inquiry, and we vacate the judgment of the District Court and remand for further proceedings.

## A. Imputation

The first question we certified to the Supreme Court of Pennsylvania concerned the test in Pennsylvania for imputing an agent's fraud to the principal. We asked:

> What is the proper test under Pennsylvania law for determining whether an agent's fraud should be imputed to the principal when it is an allegedly non-innocent third-party that seeks to invoke the law of imputation in order to shield itself from liability?

12

*Allegheny II*, 2008 WL 3895559, at *6. The Court answered the question as follows:

> The proper test to determine the availability of defensive imputation in scenarios involving non-innocents depends on whether or not the defendant dealt with the principal in good faith. While one of the primary justifications for imputation lies in the protection of innocents, in Pennsylvania . . . it may extend to scenarios involving auditor negligence, subject to an adverse-interest exception, as well as other limits arising out of the underlying justifications supporting imputation. Imputation does not apply, however, where the defendant materially has not dealt in good faith with the principal.

*Allegheny III*, 989 A.2d at 339.

Because the underlying purpose of imputation is "fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations," *id.* at 335, the Court "dr[e]w a sharp distinction between those who deal in good faith with the principal-corporation in material matters and those who do not," *id.* This "sharp distinction" led the Court to reach different policy outcomes for imputation in the negligence context versus the collusion context.

For the former, the Court saw two possibilities. First, a

13

third party would generally be able to impute an agent's bad acts to the principal corporation if they benefit the corporation (though the Court did not specify a minimum quantum of benefit). *Id.* at 333. This "creates incentives for the principal to [select and delegate responsibility to agents] carefully and responsibly." *Id.*[4] In this manner, the Court maintained the "traditional, liberal test for corporate benefit." *Id.* at 336.

Second, a third party would not be able to impute an agent's bad acts to the principal corporation if those bad acts were only in the agent's self-interest and conferred benefits only to the agent, not the corporation. *Id.* at 333–34. This is the "adverse interest" exception to imputation.

---

[4] The Court also looked for support outside the corporate auditing context to the analysis of the Delaware Court of Chancery's *AIG* decision, in which Vice Chancellor Strine made an "extensive case for strong imputation rules, including a low threshold for benefit." *Id.* at 334 & n.30 (*citing Am. Int'l Group, Inc., Consol. Derivative Litig. (AIG)*, 976 A.2d 872, 889 (Del. Ch. 2009) (Strine, V.C.)). Vice Chancellor Strine balanced the allocation of risk between (1) innocent shareholders attempting to sue derivatively a third-party corporation alleged to have conspired with the principal corporation, and (2) the principal corporation's co-conspirators, and he concluded that denying imputation would "diminish[] corporate boards' incentives to supervise their own agents." *AIG*, 976 A.2d at 889. He did not, however, address the scenario of a suit filed against a negligent auditor who failed to uncover the corporate conspiracy.

Addressing the negligent-auditor context, the Court concluded that, to the extent that an auditor is alleged to have acted negligently in conducting the corporate audit, imputing the beneficial misconduct of corporate officers (agents) to the corporation may be appropriate because such a result "gives appropriate recognition to the fact that it is the principal who has empowered the agent[,] and [imputation] dovetails with other defenses [that] may be available to a negligent auditor under prevailing Pennsylvania law, in particular, those related to audit interference." *Id.* at 335.

The Court took pains, however, to limit the corporate-benefit test to non-collusive scenarios. It took a different approach to secretive, collusive conduct between corporate agents and third parties that was "overwhelmingly adverse to the corporation" even if the collusion provided "a peppercorn of benefit." *Id.* at 334–35 (citation omitted). In such cases, "the ordinary rationale supporting imputation breaks down completely," and thus the corporation, or those in its place, may sue the corporation's auditor free of that auditor's claim that the misconduct of corporate officers is imputed to the corporation itself. *Id.* at 336. This is because "imputation rules justly operate to protect third parties on account of their reliance on an agent's actual or apparent authority," but there can be no justifiable reliance on the agent's authority when "both the agent and the third party know very well that the agent's conduct goes unsanctioned by one or more tiers of corporate governance." *Id.* Indeed, though the Court parted ways with New Jersey's *NCP*

15

decision in the negligence context,[5] it was in "full agreement with its rationale as pertaining to collusive ones." *Id.* at 336 & n.32 (*citing NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871, 881–82, 891, 896 (N.J. 2006)).

When the third party and an agent collude against the corporation, the conduct is transparently unsanctioned. Furthermore, the Pennsylvania Supreme Court rejected PwC's assertion that the "alleged, secretive falsification of corporate financial information by rogue officers can be regarded as a benefit to the corporation." *Id.* at 337. This was because "it [is] in the best interests of a corporation for the governing structure to have accurate (or at the very least honest) financial information." *Id.* at 338. Therefore, "in settings involving auditors who have not proceeded in material good faith relative to a principal-corporation," the Court "*as a matter of law . . .* decline[d] to consider a knowing, secretive, fraudulent

_____

[5] In the negligence context, the Pennsylvania Supreme Court read *NCP* "effectively [to] negat[e] imputation . . . relative to comparable claims of negligence against auditors." 989 A.2d at 335 (*citing NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871, 888, 890 (N.J. 2006)). In other words, unlike in Pennsylvania, New Jersey does not allow negligent auditors to impute to a corporation the misconduct of its corporate officers even if the corporation received a benefit from that misconduct. *See NCP*, 901 A.2d at 888 ("[A]ny benefit [to the corporation] would not be a complete bar to liability [of the auditor,] but only a factor in apportioning damages.").

misstatement of corporate financial information to be of benefit to a company." *Id.* (emphasis added).

The Supreme Court concluded its discussion of imputation by looking to what a reasonable third party should glean from its dealings with a corporate agent. The touchstone of the availability of an imputed defense for PwC is "whether there is sufficient lack of benefit (or apparent adversity) such that it is fair to charge the third party [PwC] with notice that the agent [the officer group] is not acting with the principal's [AHERF's] authority." *Id.* Collusion between agent and auditor makes imputation of the agent's conduct to its principal "unavailable [because] the auditor has not proceeded in material good faith," for the auditor is on notice that the officer-agent will withhold material information from the principal. *Id.* at 338–39 (*citing* Restatement (Third) of Agency § 5.04, cmt. c (2006)).

### B.     *In pari delicto*

The second question we certified to the Supreme Court of Pennsylvania concerned the availability of the *in pari delicto* defense to a particular auditor-liability scenario. We asked:

> Does the doctrine of *in pari delicto* prevent a corporation from recovering against its accountants for breach of contract, professional negligence, or aiding and abetting a breach of fiduciary duty, if those accountants conspired

with officers of the corporation to misstate the corporation's finances to the corporation's ultimate detriment?

*Allegheny II*, 2008 WL 3895559, at \*6. The Court responded:

> The *in pari delicto* defense may be available in its classic form in the auditor-liability setting, subject to ordinary requirements of pleading and proof (including special ones related to averments of fraud where relevant), and consideration of competing policy concerns. However, . . . imputation is unavailable relative to an auditor which has not dealt materially in good faith with the client-principal. This effectively forecloses an *in pari delicto* defense for scenarios involving secretive collusion between officers and auditors to misstate corporate finances to the corporation's ultimate detriment.

*Allegheny III*, 989 A.2d at 339.

The Court noted that although *in pari delicto* has been imported from equity and recast as an at-law defense, its origins in equity mean that it "is subject to appropriate and necessary limits." *Id.* at 330. Even though the Court was "in full accord with [the application of the *in pari delicto* defense] to instances in which a corporate plaintiff can be said to be at least equally culpable relative to the subject of its lawsuit, . . . matters of

18

public policy [are] to be taken into consideration in determining the defense's availability in any given set of circumstances." *Id.* *In pari delicto* is not to be "woodenly applied and vindicated in any and all instances," but instead may be trumped by another policy more important than the policy basis for the doctrine itself. *Id.* (*citing Am. Int'l Group, Inc., Consol. Derivative Litig.*, 976 A.2d 872, 888 (Del. Ch. 2009) (Strine, V.C.)). Public policy (as set out below) is what undergirds *in pari delicto*, not a concern with the interests of the party claiming it as a defense. *Id.* at 330 n.21 (citations omitted).

Looking specifically at the auditor-liability setting, the Court examined the Seventh Circuit Court's "pioneering decision" in *Cenco v. Seidman & Siedman*, 686 F.2d 449 (7th Cir. 1982) (Posner, J.). It read *Cenco* as "favor[ing] a very strong application" of *in pari delicto* based on the policy judgment that it is desirable to "incentivize[] independent directors and even stockholders to be effective monitors of managerial behavior." 989 A.2d at 331–32 (citation omitted). The Supreme Court, however, prioritized the policy objectives of the "traditional schemes governing liability in contract and in tort" over the policy of incentivizing internal corporate monitoring. *Id.* at 332. In so doing, it disapproved of *Cenco* and our *Lafferty* decision to the extent that they place the policy objectives of corporate monitoring ahead of those contemplated by the traditional schemes governing liability. *Id.* at 332 &

19

n.25.[6]

The Supreme Court was "cognizant of the special—and crucial—role assumed by independent auditors as a check against potential management abuses," and took the

_____

[6] In that respect, we note that *Lafferty* relied on a portion of *Cenco* analyzing jury instructions and equating breach of contract, negligence, and fraud as "a single form of wrongdoing under different names" when committed by auditors that may be subject to a defense of *in pari delicto*. *Lafferty*, 267 F.3d at 355 (*quoting Cenco*, 686 F.2d at 454). The *Cenco* decision determined the correctness of those *in pari delicto* jury instructions through an examination of in "what circumstances, if any, fraud by corporate employees is a defense in a suit by the corporation against its auditors for failure to prevent the fraud." *Cenco*, 686 F.2d at 454. Judge Posner predicted how Illinois courts would decide the case by analyzing it as a matter of deterrence. *Id.* at 455. He concluded that "if the owners of the corrupt enterprise are allowed to shift the costs of its wrongdoing entirely to the auditor, their incentives to hire honest managers and monitor their behavior will be reduced." *Id*. Therefore, "the corporation should not be allowed to shift the entire responsibility for the fraud to its auditors. *Id.* at 456.

To the extent that our *Lafferty* decision relied on *Cenco*'s reasoning and not merely its recitation of the various causes of action in which *in pari delicto* may apply, we are now explicitly on notice that our prediction of Pennsylvania law is "disapproved." 989 A.2d at 332 n.25.

20

complexities of the auditor relationship "into account as a factor in a responsible policy-setting decision." *Id.* Thus, in the absence of more information regarding "the growing prevalence of breathtaking malpractice claims against auditors in the corporate insolvency setting . . .[,] the corresponding litigation burden, and the resultant impact on the profession as a whole . . . as well as those they serve," the Supreme Court refused to create a general rule against auditors asserting an *in pari delicto* defense. *Id.* at 332–33. Instead, it noted that while *in pari delicto* may be available to auditors generally, one who has not dealt materially in good faith with the client-principal will be "effectively foreclose[d] [from asserting] an *in pari delicto* defense for scenarios involving secretive collusion between officers and auditors to misstate corporate finances to the corporation's ultimate detriment." *Id.* at 339. This is because imputation to the corporation of its officers' misconduct will not be available to the colluding auditors. *Id.*

### C.    Application to this case

The District Court determined that any benefit to AHERF was sufficient to impute the misconduct of its managers to the corporation. This, combined with *in pari delicto*, led it to grant summary judgment in favor of PwC. The Supreme Court of Pennsylvania has since clarified the test for imputation when there is collusive conduct between the agent and a third-party (such as an auditor), and this intervening change in law warrants a remand.

21

While *Allegheny III* maintained the potential availability of *in pari delicto* in the auditor-liability setting, that defense is conditioned on the auditor dealing materially in good faith with the client-principal. The District Court's analysis did not consider whether PwC dealt with AHERF in good faith, and it is appropriate for it to consider the issue in the first instance. Furthermore, two key aspects of the District Court's holding need to be revisited in light of *Allegheny III*: (1) the District Court's use of an "any benefit" test is not appropriate because "a peppercorn of benefit" cannot "provide total dispensation to defendants knowingly and substantially assisting insider misconduct that is overwhelmingly adverse to the corporation," 989 A.2d at 335; and (2) the District Court's identification of misstated financials as enabling short term benefits to AHERF was incorrect because "as a matter of law . . . a knowing, secretive, fraudulent misstatement of corporate financial information" is not "of benefit to a company," *id.* at 338.

\* \* \* \* \*

The Supreme Court of Pennsylvania has clarified the law of imputation and *in pari delicto* in the less-than-clear area of collusive fraud between third parties and agents against a principal corporation. With this added clarity, we now vacate and remand to the District Court for further proceedings, including a determination of whether PwC dealt with AHERF in good faith.

22