**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4298
_____

EDWARD M. SEAMANS,

Appellant

v.

TEMPLE UNIVERSITY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2:11-cv-06774)
District Judge: Honorable Stewart Dalzell
_____

Argued September 24, 2013

Before: CHAGARES, VANASKIE and SHWARTZ,
*Circuit Judges*

(Filed: February 21, 2014)

Gregory J. Gorski, Esq.  [ARGUED]
Mark D. Mailman, Esq.
John Soumilas, Esq.
Francis & Mailman
100 South Broad Street
Land Title Building, 19th Floor
Philadelphia, PA 19110
        *Counsel for Appellant*

Richard J. Perr, Esq.  [ARGUED]
Fineman, Krekstein & Harris
1735 Market Street
Mellon Bank Center, Suite 600
Philadelphia, PA 19103
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge*.

In this case we consider for the first time the interplay between the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x, and the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1001–1155, with respect to the responsibilities of an institution of higher education that furnishes information on student loan indebtedness to a consumer reporting agency ("CRA").  Edward M. Seamans appeals an order of the United States District Court for the Eastern District of Pennsylvania, which granted summary judgment to defendant Temple University ("Temple") on Seamans's claims for negligent and willful violations of

FCRA in connection with Temple's reporting of certain information to CRAs concerning Seamans's student loan. For the following reasons, we will vacate and remand.

I.

On January 16, 1989, Seamans received a need-based Federal Perkins Loan (the "Loan") of $1,180.00 from Temple. The first payment on the Loan was due on January 20, 1992. Upon Seamans's failure to make payment within the fifteen-day grace period, the loan was declared delinquent on February 4, 1992. On August 3, 1992, with the full balance of the Loan still unpaid, Temple notified Seamans that the account had been placed for collection.

In January 2010, Seamans enrolled as a full-time student at Drexel University. In the spring of 2011, Seamans sought financial aid in the form of a Pell Grant, but Drexel refused to provide Seamans with financial assistance until he repaid the balance of the still-outstanding Loan. On April 28, 2011, Seamans repaid the Loan in full.

In May 2011, allegedly for the first time in many years, Seamans noticed a "trade line" on his credit report summarizing data pertaining to the Loan. For reasons unknown, that trade line may or may not have actually appeared on Seamans's credit report at the times it indisputably should have—namely, between February 1992 and April 2011, when the account was in default. Because Seamans's claim is predicated only on Temple's conduct after he disputed the trade line, whether and how Temple reported information about the Loan before Seamans lodged his dispute is irrelevant.

3

What is not in dispute is that in the aftermath of Seamans's repayment of the Loan, Temple reported certain Loan-related data to TransUnion, a CRA. We observe at the outset that much reporting of consumer credit data, including the bulk of the reporting by Temple in this case, takes the form of "codes" rather than text. For the sake of clarity, we refer primarily to the underlying interpretations of the codes, which are undisputed, rather than to the codes themselves. Relevant categories of coded information include (1) the "date of first delinquency," which refers to the initial date upon which the loan had been marked as defaulted; (2) the "payment history," which documents the debtor's month-by-month payment record; (3) the "account status," which documents a particular status for a given debt, including whether an account is open, closed, paid, or unpaid; and (4) the "compliance condition," which indicates whether the reported information is disputed by the consumer.

In the aftermath of Seamans's payment, Temple had provided the following information to TransUnion:

> (a) [Seamans] had been over 180 days late for at least twenty-four (24) months prior to the time the Perkins [L]oan was paid in full;
>
> (b) the Account Status was report[ed] as 'Current; Paid or Paying as Agreed;'
>
> (c) the Balance was report[ed] as '$0;'

4

(d) the High Balance was report[ed] as '$1180;'

(e) the Terms was report[ed] as '120 Monthly $30;'

(f) the Date Open was report[ed] as '10/1991;' and

(g) the Date Closed was report[ed] as '04/2011.'

App. 64–65. Temple did not report the date of first delinquency for the Loan (*i.e.*, February 4, 1992), and also did not report that the account had ever been placed for collection.

On May 17 and May 20, 2011, Seamans formally disputed portions of that information by contacting TransUnion. Seamans's May 17 dispute, which he submitted online, stated:

Loan defaulted 1992. Temple didn't report in a decade+, and charged off long ago. I paid Temple on 4/30, they retroactively reported years of 120d late payments, but it had been co'd. Nothing from Temple was on my report until I fully paid to close account. Why does report show two years of late payments?

5

App. 207. Seamans's May 20 dispute was made by telephone. TransUnion in turn notified Temple of the May 17 and May 20 disputes and asked it to verify, among other things, the "payment history profile" and "account status" of the Loan.

In response, Temple, through its loan servicer, ACS Education Services, Inc. ("ACS"), conducted an investigation. ACS had contracted with Temple to respond to consumer disputes on Temple's behalf in exchange for $2 per dispute "received and processed" by ACS. The procedure followed by ACS in these investigations was essentially to verify that the reported data was in fact consistent with Temple's internal documentation pertaining to the Loan.[1]

On May 23, 2011, Temple resubmitted the information to TransUnion virtually unchanged. Again, Temple did not indicate when the Loan first became delinquent or that it had ever been placed for collection. Nor did Temple report by way of a "compliance condition" code that Seamans now disputed the trade line.

On August 1, 2011, Seamans contacted Temple, TransUnion, and another CRA, Equifax, again to dispute the

---

[1] ACS is not a defendant in this case. Both parties appear to impute the actions, procedures, and policies of ACS to Temple throughout their briefing, and so far as we can tell, Temple does not legally attempt to distance itself from ACS in any respect. Consequently, we at times refer to "Temple's reporting" even in places where ACS acted as Temple's agent with regard to the relevant filings and communications.

continued appearance of Temple's trade line on his credit report.  Seamans's letter to TransUnion stated:

> In 1989 I received a Perkins Loan while attending Temple University.  I defaulted on the loan and the loan went to collection.  No activity occurred on the account for some time, and the account eventually came off my credit reports for all three of the reporting agencies.  I recently began attending school again at Drexel University, and in order to qualify for financial aid, I had to settle the Perkins loan default.  I walked into Temple's billing department and paid $2009 dollars [sic] on the spot, receiving a letter on Temple University letterhead that the debt was settled.  Temple went on to *retroactively* report two years worth of 120-day late payments to the credit reporting agencies.  It is important to note that there was no reporting on this account to the credit bureaus for many years, and then suddenly *after* the debt was paid, Temple reported two years worth of late payments all at once.

> I previously disputed this online, and received a letter stating that the creditor has reviewed the account and wishes to make no further adjustment to my credit record.
>
> To put it plainly, I want the Temple University account removed from my credit report. The account is closed, and well beyond the time limit imposed for the reporting of derogatory credit information. Therefore, it should not appear on my credit reports now. I have been a good consumer for years now, and the Temple reporting instantly negatively impacted my Trans Union score by approximately 80 points.

App. 258. Temple was notified of the August 1 dispute and received copies of the letters written by Seamans to TransUnion and Equifax. After a second investigation, Temple modified certain elements of its report on the Loan but still did not report the Loan's history in collections, a date of first delinquency, or the fact that Seamans was disputing the accuracy of the reported information.

Seamans points to evidence that Temple's non-reporting with respect to certain information about the Loan was not unique. For example, an ACS employee testified at

8

deposition that at least until late 2011, ACS's policy was that its employees would *never* flag an account as disputed, regardless of the nature of the consumer's challenge:

> Q Let's go to the document ACS-2 again. Within ACS-2 can you point me to any particular portion of it which relates to reporting an account as disputed by the consumer in the compliance condition code portion of the Metro 2 code?
>
> A No, there is not.
>
> Q And is the reason for that because up until . . . November of 2011, ACS did not report accounts as disputed to credit reporting agencies whether affirmatively or after a dispute had been received?
>
> A Correct.

App. 485–86. The same employee explained that ACS never included dates of first delinquency in its reports even after disputes were lodged. App. 482–83. A different customer service representative from ACS testified at deposition that she spent an average of 15 minutes on any given dispute and that ACS provided no written guidelines or formal training from managers for her. App. 350–53.

On October 28, 2011, Seamans filed a complaint against Temple in the United States District Court for the Eastern District of Pennsylvania, alleging that Temple negligently or willfully violated FCRA with respect to its reporting of the Loan. On May 21, 2012, Temple moved for summary judgment, arguing in essence that HEA exempted it from compliance with FCRA because the credit instrument at issue was a Perkins Loan. On October 25, 2012, the District Court granted the motion in full and entered judgment on the following day in favor of Temple. Seamans appeals from that judgment.

## II.

## A.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p. We have jurisdiction under 28 U.S.C. § 1291.

Our review of a District Court's grant of summary judgment is plenary. *Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 607 F.3d 346, 351 (3d Cir. 2010). A moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is "[a] fact[ ] that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (quotation marks omitted). All facts

10

are viewed in the light most favorable to the nonmoving party, who is "entitled to every reasonable inference that can be drawn from the record." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). Questions of statutory interpretation are also subject to *de novo* review. *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003).

B.

Seamans brings this action under 15 U.S.C. §§ 1681n and 1681o, which permit private suits for damages against parties who willfully or negligently fail to comply with certain duties to consumers under FCRA. Specifically, Seamans contends that Temple's investigation of his claims was unreasonable, and that even after he had lodged a detailed written dispute with TransUnion, Temple continued to omit the Loan's history in collections, its date of first delinquency, and even the fact of his dispute itself. He claims that these violations caused him to suffer actual damages in the form of "lost credit opportunities, harm to credit reputation and credit score, and emotional distress." He also seeks punitive damages under 15 U.S.C. § 1681n for the violations that he contends were willful.

Resolution of this appeal requires us to consider several discrete issues. In Part III of this Opinion we address the extent of Temple's duties under FCRA as a furnisher of credit information, and whether HEA materially impacts those duties. In Part IV-A, we decide whether Seamans has raised a genuine issue of material fact as to the completeness and accuracy of Temple's post-dispute filings and the reasonableness of Temple's post-dispute investigative and corrective procedures. Next, in Part IV-B, we consider

11

Temple's claim that FCRA does not permit private citizens such as Seamans to sue for damages caused by a furnisher's failure to mark an account as disputed. Finally, in Part IV-C, we address whether Seamans has stated a claim under § 1681n for willful FCRA violations that, if proved, would allow him to recover punitive damages.

III.

A.

FCRA, enacted in 1970, created a regulatory framework governing consumer credit reporting. That framework "was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quotation marks omitted). Under FCRA, CRAs collect consumer credit data from "furnishers," such as banks and other lenders, and organize that material into individualized credit reports, which are used by commercial entities to assess a particular consumer's creditworthiness.

FCRA imposes a variety of obligations on both furnishers and CRAs. For instance, to protect consumers from having their credit forever impaired by aging debts, CRAs are precluded from reporting accounts which have been "placed for collection" or "charged to profit and loss" more than seven years prior to the report. 15 U.S.C. § 1681c(a)(4). Other "adverse item[s] of information," aside from criminal convictions, also may be reported only for seven years after the adverse event. *Id.* § 1681c(a)(5). When

12

the seven-year threshold for these items is reached, CRAs may no longer lawfully report that data: in industry parlance, it has "aged off" the consumer's credit report.

When a furnisher provides information to a CRA regarding an account placed for collection or charged to profit or loss, the furnisher then has 90 days in which to notify the CRA of the account's "date of delinquency," which is defined as "the month and year of the commencement of the delinquency on the account that immediately preceded the action." *Id.* § 1681s-2(a)(5)(A). The date of delinquency enables the CRA to calculate the seven-year window for "aging-off" purposes—without it, the CRA would be unable to determine when the account had been placed for collection, rendering the "aging-off" date impossible to calculate.[2]

Temple concedes that under these provisions, if a non-education loan had been first marked delinquent in early 1992 and placed for collection later that year, a furnisher would be obligated to report those facts under 15 U.S.C. § 1681s-2(a)(5)(A). Consistent with the terms of 15 U.S.C. § 1681c(a)(4), the trade line would have "aged off" the consumer's credit report at some point in 1999.

B.

HEA, enacted in 1965 and amended repeatedly thereafter, contains a provision that instructs CRAs to

_____

[2] We use the term "seven-year window" somewhat loosely. For purposes of accounts placed for collection or charged to profit and loss, the seven-year period technically begins 180 days after the date of first delinquency. 15 U.S.C. § 1681c(c)(1).

13

disregard FCRA's "aging-off" provisions when reporting data on certain federally backed education loans. *See* 20 U.S.C. § 1087cc(c)(3). This section provides as follows:

> Notwithstanding paragraphs (4) and (5) of subsection (a) of section 1681c of Title 15, a consumer reporting agency may make a report containing information received from . . . an institution regarding the status of a borrower's account on a loan made under this part until the loan is paid in full.

*Id.* The upshot of this provision is that a defaulted Perkins Loan, if left unpaid, can remain on a person's credit report indefinitely—it does not "age off" a person's credit report after seven years by operation of law.[3] The bill's legislative history explains the underlying rationale of that provision:

> These changes represent a simplification effort and provide consistency between the statute of limitations for collecting loans and the period for reporting negative credit information. The

---

[3] The text of the provision is permissive, providing that CRAs "*may* make a report . . . until the loan is paid in full." 20 U.S.C. § 1087cc(c)(3) (emphasis added). We express no opinion as to whether HEA affirmatively obligates CRAs to make such reports until qualifying loans are fully repaid.

> committee believes that reporting
> of defaulted loans to credit
> bureaus is an effective tool and
> should be available to institutions
> and the Secretary of Education for
> the entire period that loan
> collection is allowed.

S. Rep. No. 105-181, at 58 (1998).[4]

## C.

We now consider whether the reporting obligations of Temple, a furnisher of consumer credit data under FCRA, are affected by 20 U.S.C. § 1087cc(c)(3). When, as here, the question is one of statutory construction, the appropriate starting place is with the statutory text. "When the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete."

---

[4] The HEA provision at issue sits within a much lengthier section of the statute that establishes detailed furnishing and reporting requirements when an institutional furnisher enters into a formal "cooperative agreement" with a CRA. *See generally* 20 U.S.C. § 1087cc(c). The record before us contains no evidence of such an agreement. Because 20 U.S.C. § 1087cc(c)(3) appears to be freestanding in the sense that its applicability does not depend on the presence of a formal "cooperative agreement," we address the ramifications of that subsection only and express no opinion on the effect of other portions of 20 U.S.C. § 1087cc(c) on a furnisher's reporting duties under FCRA.

15

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (quotation marks omitted).

The text of HEA is unambiguous in a crucial respect—namely, it refers only to CRAs:

> Notwithstanding paragraphs (4) and (5) of subsection (a) of section 1681c of Title 15, a *consumer reporting agency* may make a report containing information received from . . . an institution [of higher education] regarding the status of a borrower's account on a loan made under this part until the loan is paid in full.

20 U.S.C. § 1087cc(c)(3) (emphasis added). The text does not mention furnishers of consumer credit data.

Temple's primary argument is that despite the absence of a specific reference to furnishers, HEA nonetheless functionally compels educational institutions to omit the date of first delinquency and collection history when reporting Perkins Loans to CRAs. This is based on Temple's worry that if it had continuously reported the Loan's full history, including the items at issue such as collection history and date of delinquency, the CRAs may have failed to notice that the Loan was an HEA-qualifying education loan and instead may have treated the Loan as a standard-order defaulted debt. Under that scenario, according to Temple, the CRAs may have mistakenly allowed the Loan to "age off" Seamans's credit report in 1999. Temple rationalizes that by simply

16

omitting from its report all facts that could trigger the "aging off" provisions, Temple was helping the CRAs comply with 20 U.S.C. § 1087cc(c)(3) and, in practice, furthering the congressional intent to prevent unpaid student loans from "aging off" credit reports.

As an initial matter, we find it difficult to credit the implicit suggestion that Temple had no avenue, whether through the intricate coding system described above or in some other way, by which to signal affirmatively to the CRAs that a given loan is an HEA-qualifying education loan. In other words, surely Temple could have allayed its own concerns about the CRAs' possible mischaracterization of the Loan by providing them with *more* information rather than *less*.

Nevertheless, whether this is the case or not, the question of whether a particular loan should or should not "age off" a credit report must be answered by the CRAs, and not by furnishers such as Temple. If CRA procedures had allowed the Loan's trade line to expire in 1999, in possible contravention of 20 U.S.C. § 1087cc(c)(3), that would be the CRAs' statutory concern, not an excuse for Temple to report loan information in an incomplete or inaccurate manner. As stated recently by the Supreme Court, "even the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text." *Kloeckner v. Solis*, 133 S. Ct. 596, 607 n.4 (2012). The strange compliance-by-omission described by Temple is not present in the statutory text at issue and we decline to read such a procedure into it.

Temple also notes its belief that any loan fully repaid according to its original schedule will remain on a person's

17

credit report for 10 years after final payment.[5]  Thus a "good borrower" could take out an education loan and fully pay the loan on schedule in 4 years, but would then carry the trade line on her credit report for 10 years afterward.  Temple claims that under Seamans's reading of FCRA and HEA, a "bad borrower" who took out a federal education loan and immediately defaulted could then pay the loan 8 years later and see the trade line expunged immediately, because it would be more than 7 years past the date when the loan was sent for collection.  The "good borrower" thereby "carries" the trade line on her credit report for more time (14 years) than the "bad borrower" (8 years).  Temple suggests that this inequity is a good reason to interpret the relevant statutes in its favor.

Temple has provided no evidence, however, that the appearance of a *non-adverse* payment history, *i.e.*, the one appearing on the "good borrower's" credit report, would impair the "good borrower's" credit score.  There is nothing to show, in other words, that these disparate outcomes are inequitable to the "good borrower" at all.  Indeed, FRCA itself reflects a policy choice to allow dated adverse credit data to "age off" a credit report because such information might otherwise indefinitely hamper the borrowing capabilities of now-reformed individuals.  Non-adverse credit information, by contrast, can be reported indefinitely—at

---

[5] The record is unclear on this point.  There is evidence that Equifax has a policy under which it ceases reporting non-adverse credit information after 10 years—that is to say, a borrower's *good* credit history will only show up on an Equifax credit report for 10 years.  That window does not appear to be fixed by law.

least in part because it demonstrates that a person has been a reliable borrower in the past and will presumably continue to be such in the future.

We thus disagree with the District Court's conclusion that 20 U.S.C. § 1087cc(c)(3) effectively exempts the Loan from FCRA's "aging off" provision indefinitely. Instead, the statutory text of 20 U.S.C. § 1087cc(c)(3) makes clear that the seven-year window described in 15 U.S.C. § 1681c(a)(4) is extended only "until the loan is paid in full." Accordingly, once Seamans's loan had been repaid, the trade line pertaining to the Loan should have "aged off" his credit report pursuant to 15 U.S.C. § 1681c(a)(4), because the Loan by that time had been placed for collection more than seven years prior. In reality, however, the trade line did *not* "age off," and it did not "age off" because Temple never provided the CRAs with the collection history and date of delinquency. Instead, Temple's incomplete and misleading reporting made it appear as if Seamans had simply made a late repayment on a non-defaulted loan in 2011, which, under 15 U.S.C. § 1681c(a)(5), could be recorded on his credit report until 2018.

Under the reading of HEA advanced by Temple, a borrower such as Seamans, who initially defaults on an education loan and then later repays it, is penalized twice: once because the loan, if unpaid, will not be removed from his credit report, and twice, because even after payment, the loan's trade line will persist for another seven years. We find this consequence to be inconsistent with Congress's expressed intent that "reporting of defaulted [education] loans to credit bureaus is an effective tool and should be available to institutions . . . for the entire period that loan collection is allowed." S. Rep. No. 105-181, at 58 (1998). The first

19

penalty, to be sure, is an "effective tool" indeed, providing great motivation for a borrower to repay even very old education loans. The second penalty, however, reaches beyond the "period that loan collection is allowed," and serves little purpose. Once the debt is paid, the threat that the negative payment history will persist for another seven years as "adverse information" gives the borrower no further motivation—he has already done everything in his power to satisfy the debt.

In sum, both a straightforward reading of the statutory text and an assessment of the legislative intent compel the conclusion that HEA did not exempt Temple, as a furnisher, from its typical reporting obligations under FRCA. We conclude that furnishers of consumer credit data remain obligated to report fully and accurately under FCRA regarding the collection history and date of delinquency for even an HEA-qualifying education loan.

## IV.

## A.

We now address whether Seamans has raised a genuine issue of material fact regarding his claim that Temple negligently failed to conduct a reasonable post-dispute investigation and thereafter failed to correct inaccurate and incomplete reporting as to the Loan. Section 1681o [6]

---

[6] The relevant portion of § 1681o(a) states:

> Any person who is negligent in failing to comply with any requirement imposed under this

20

authorizes consumers to bring suit for damages caused by a furnisher's negligent breach of its duties to consumers under 15 U.S.C. § 1681s-2(b).[7] *See SimmsParris v. Countrywide*

subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of-
    (1) any actual damages sustained by the consumer as a result of the failure; and
    (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

[7] The relevant portion of § 1681s-2(b)(1) states:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a [CRA], the person shall-
    (A) conduct an investigation with respect to the disputed information;
    (B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) of this title;

*Fin. Corp.*, 652 F.3d 355, 358 (3d Cir. 2011). Although furnishers such as Temple are obligated to provide complete and accurate information to CRAs even in the first instance,

> (C) report the results of the investigation to the [CRA];
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly-
> (i) modify that item of information;
> (ii) delete that item of information; or
> (iii) permanently block the reporting of that item of information.

22

*i.e.*, before a dispute, under 15 U.S.C. § 1681s-2(a), FCRA explicitly precludes private suits for failure to comply with that statutory duty, 15 U.S.C. § 1681s-2(c), and instead provides for enforcement of that provision by federal and state officials, 15 U.S.C. § 1681s-2(d). The claims here are thus predicated solely on Temple's conduct *after* it was informed of Seamans's dispute by TransUnion.

We have previously held that a furnisher's post-dispute investigation into a consumer's complaint must be "reasonable," *SimmsParris*, 652 F.3d at 359, but did not expound upon what that standard requires. We have recognized, though, that CRAs also are required to follow "reasonable procedures" with respect to the accuracy of consumer data under FRCA, *see* 15 U.S.C. § 1681e(b),[8] and in that similar context we have explained that a reasonable procedure is one "'that a reasonably prudent person would undertake under the circumstances.'" *Cortez,* 617 F.3d at 709 (quoting *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996)). That issue "is normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." *Id.* (quotation marks omitted).

We also stated in *Cortez* that when assessing reasonableness, the factfinder must balance "the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." *Id.* The Court of Appeals for the

---

[8] The relevant portion of 15 U.S.C. § 1681e(b) states: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

Fourth Circuit has explicitly defined a furnisher's duty in similar terms. *See Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 432–33 (4th Cir. 2004) (holding that the reasonableness of a furnisher's investigation involves weighing "the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information" (quotation marks omitted)); *see also Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599, 605 (E.D. Pa. 2012) (applying *Johnson*). We join our sister Circuit in holding that the same balancing test we applied in *Cortez* with respect to the reasonableness of a CRA's procedures applies to investigations conducted by furnishers as well.

Other Courts of Appeals have evaluated the reasonableness of a furnisher's investigative procedure as it relates to the content of the notice of dispute sent by the CRA to the furnisher.[9] For instance, where a given notice contains only scant or vague allegations of inaccuracy, a more limited investigation may be warranted. *See Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616–17 (6th Cir. 2012); *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38–41 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157–61 (9th Cir. 2009); *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). Likewise, "[i]f a CRA fails to provide 'all relevant information' to a furnisher,

---

[9] As we explained in *SimmsParris*, "a consumer must first alert the [CRA] that reported the allegedly erroneous information of a dispute. It is then up to the [CRA] to inform the furnisher of information that there has been a dispute, thereby triggering the furnisher's duty to investigate. . . ." 652 F.3d at 359. Such notice "cannot come directly [to the furnisher] from the consumer." *Id.* at 358.

then the consumer has a private cause of action against the CRA, 15 U.S.C. §§ 1681i(a)(2)(A), 1681n-o, but not against the furnisher." *Chiang*, 595 F.3d at 38. We agree that this too is an important factor in assessing the reasonableness of a furnisher's investigation.

The meaning of "completeness" and "accuracy" in the specific context of a furnisher's duties under FCRA is also a matter of first impression in this Court. It is not seriously debated, however, that factually incorrect information is "inaccurate" for purposes of FCRA. *See, e.g.*, *Boggio*, 696 F.3d at 617. And we agree with the three Courts of Appeals to have considered the question that even if the information is technically correct, it may nonetheless be inaccurate if, through omission, it "create[s] a materially misleading impression." *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008); *see also Boggio*, 696 F.3d at 617; *Gorman*, 584 F.3d at 1163. Whether technically accurate information was "'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect'" is generally a question to be submitted to the jury. *Gorman*, 584 F.3d at 1163 (quoting *Saunders*, 526 F.3d at 150).

Here, the District Court granted Temple's motion for summary judgment principally because Temple's reporting had not caused the undesired trade line to appear on Seamans's credit report. App. 22–23. In the alternative, the District Court found that Temple's employment of an outside vendor, ACS, to conduct consumer credit investigations on Temple's behalf was reasonable as a matter of law, App. 30–31, and that the information actually provided by Temple in

response to Seamans's dispute was complete and accurate in light of its obligations under FCRA and HEA. App. 31–34.

We disagree with the District Court's conclusion that Seamans is unable to establish causation for the alleged harm to his credit and the associated negative consequences. Under our interpretation of FCRA and HEA, the trade line's appearance on Seamans's credit report is directly traceable to Temple's failure to report the Loan's collection history and date of delinquency. Whether the harms alleged by Seamans, *i.e.*, a drop in credit rating and associated loss of credit opportunities, can be linked to the appearance of the trade line on his credit report remains a disputed question of fact.

Similarly, the record contains genuine issues of material fact regarding the extent to which the above-described omissions were attributable to unreasonable investigative and corrective procedures. The parties agree that Temple was fully notified of the nature of Seamans's dispute and in fact received, through proper channels, a copy of the August 1, 2011 letter in which Seamans provided a detailed basis for his complaint. Evidence also exists that Temple's loan servicer routinely allotted a minimal amount of time to the investigation of each claim, and that its investigative procedures and corrective protocols regarding accounts sent for collection and dates of first delinquency were justified by a plainly erroneous interpretation of Temple's legal obligations as a furnisher. Under the standards we announced in *Cortez*, we find on the record before us a genuine issue of material fact as to whether Temple's conduct was reasonable.

Finally, we conclude that the District Court erred with respect to its characterization of Temple's reporting as

indisputably accurate and complete. As described above, the information Temple provided may have been incomplete and inaccurate insofar as it did not disclose the account's date of first delinquency or the fact that the account had been placed for collection in 1992.

In sum, we conclude that genuine issues of material fact exist as to whether Temple negligently failed to comply with its obligations under FCRA. Accordingly, we will vacate the District Court's order granting summary judgment in favor of Temple and remand for further proceedings.

## B.

Along with Seamans's claim that Temple was obligated to correct its reporting of his account's collections history and date of first delinquency, he contends that Temple violated FCRA by failing to flag his account as disputed in its later reporting to TransUnion and other CRAs. FCRA imposes an explicit duty on furnishers of credit information to report a dispute to all CRAs to whom it provides the information as part of a reasonable investigation. 15 U.S.C. § 1681s-2(a)(3). [10] Private enforcement of that obligation,

---

[10] 15 U.S.C. § 1681s-2(a)(3) states:

> If the completeness or accuracy of any information furnished by any person to any [CRA] is disputed to such person by a consumer, the person may not furnish the information to any [CRA] without notice that such information is disputed by the consumer.

27

however, as with other duties arising under § 1681s-2(a), is not permitted. *Id.* § 1681s-2(c)(1). The question presented is whether a furnisher's continuing failure to flag an account as disputed also constitutes a violation of 15 U.S.C. § 1681s-2(b), which as discussed above, requires complete and accurate post-dispute reporting of debts, and is privately enforceable by virtue of § 1681o.

The two Courts of Appeals to have considered this question have both answered it in the affirmative. In *Saunders v. Branch Banking*, discussed *supra*, the Fourth Circuit considered the interaction of § 1681s-2(a), which requires complete and accurate pre-dispute reporting of loan data, and is not privately enforceable, with § 1681s-2(b), which imposes investigative and corrective duties on furnishers, and is privately enforceable. 526 F.3d at 148–50. The panel noted that "[n]o court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s-2(b) by arguing that it should have *already* reported the information accurately under § 1681s-2(a)." *Id.* at 149–50. In other words, the fact that a furnisher is affirmatively obligated to flag an account as disputed under § 1681s-2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s-2(b). *See also Gorman*, 584 F.3d at 1163 (explaining that where a dispute is bona fide, "the omission of the disputed nature of a debt could render the information sufficiently misleading so as to be 'incomplete or inaccurate' within the meaning of [§ 1681s-2(b)]"); *Van Veen*, 844 F. Supp. 2d at 606 (applying *Saunders* and *Gorman*).

28

We agree with this assessment, and conclude that a private cause of action arises under 15 U.S.C. § 1681s-2(b) when, having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed.[11] We further find that a genuine issue of material fact exists as to whether Temple violated that duty here. The District Court held that Temple was under no obligation to report Seamans's dispute because that dispute "was not *bona fide* given the status of [the Loan]

---

[11] Temple argues that our holding in *SimmsParris* supports the opposite conclusion. We disagree. That decision simply clarifies that before a consumer can bring a private claim against a furnisher for failure to provide accurate information to CRAs, he must first notify the CRA, who then notifies the furnisher and thereby triggers the furnisher's duty to undertake a reasonable investigation and corrective measures if warranted. *SimmsParris*, 652 F.3d at 359.

It may seem peculiar that FCRA compels a furnisher, who can only be formally notified of a dispute by a CRA, to then re-designate the account as disputed in its submission back to the same CRA, which of course already knows about the dispute, having been the initial recipient of notice from the consumer. But this requirement serves two purposes: first, the furnisher, not the CRA, is in the best position to determine whether the dispute is bona fide, and thus the furnisher's validation of the dispute signifies that the dispute is genuine; and second, the furnisher must provide notice of the dispute to all CRAs to whom it originally submitted the information—not just to the CRA which initially notified the furnisher of the dispute.

under the HEA." For the reasons already stated, however, we find that Seamans's dispute appears to have merit, and the failure to report that dispute may constitute a material inaccuracy on Seamans's credit report.

Accordingly, we will vacate the District Court's order granting summary judgment for Temple on Seamans's claims under § 1681o insofar as they are predicated upon an alleged violation of § 1681s-2(b) for failure to report the disputed nature of the Loan.

## C.

Along with permitting actual damages, costs, and attorney's fees for negligent violations of duties imposed under § 1681s-2(b), FCRA also provides for an award of punitive damages for willful violations of those same duties under 15 U.S.C. § 1681n.[12] Liability for willful violations

---

[12] The relevant portion of § 1681n(a) states:

> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of-
> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
> . . .

30

will lie not only in the case of knowing violations of the statute but also if a defendant acts with "reckless disregard" of the statute's terms. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007). "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* An actor's "subjective bad faith" is irrelevant—the test is whether the actor's conduct was "objectively unreasonable." *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 248–49 (3d Cir. 2012).

In determining whether an actor's conduct was reckless, a court should examine the text of the statute, case law that existed at the time of the alleged violation, and any agency interpretations. *Safeco*, 551 U.S. at 69–70. "[A] dearth of authoritative guidance" makes it less likely that a party's conduct was objectively unreasonable, but the absence of such authority does not "immunize" an actor from potential liability where the statute is "far too clear" to support the

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

31

actor's interpretation. *Cortez,* 617 F.3d at 721–22. We have noted as to FCRA in particular that:

> [T]he breadth and scope . . . is both evident and extraordinary. . . . Moreover, it is undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it. . . . [I]t is imperative that we do not allow a company that traffics in the reputations of ordinary people a free pass to ignore the requirements of the FCRA each time it creatively incorporates a new piece of personal consumer information in its reports.

*Id.* at 721–23 (citations and quotation marks omitted).

A furnisher's objectively unreasonable actions with respect to a particular consumer's account can support a jury finding of willfulness. Blanket policies, too, can underpin such a finding. *See, e.g.*, *Boggio*, 696 F.3d at 620 (remanding for a jury trial as to whether a furnisher's policy "prohibit[ing] its employees from performing anything more than a cursory confirmation of [the consumer's] status before reporting back to a CRA" constituted willful violation of the FCRA); *Van Veen*, 844 F. Supp. 2d at 610 (denying defendant's motion for summary judgment as to willfulness where furnisher's policies "never result in marking an

account as disputed" and where the furnisher's analysts were allotted only "5 to 10 minutes" for investigations).

Here, the District Court endorsed the reasonableness of Temple's conduct and concluded that a jury could not find Temple had acted willfully under *Safeco*. App. 24–25. But as noted earlier, we conclude that Temple's construction of the HEA is in fact foreclosed by the straightforward statutory text. HEA simply does not affect reporting obligations under FCRA for furnishers such as Temple. Beyond that, Seamans points to evidence that undertrained ACS representatives spent, on average, only 15 minutes investigating each dispute, and that the policy of ACS was to *never* flag accounts as disputed or to report dates of first delinquency. If true, these policies would appear to be in outright conflict with a furnisher's duties under FCRA.

We will therefore vacate the District Court's order with respect to its dismissal of Seamans's claim for punitive damages under § 1681n and remand for further proceedings.

V.

For the foregoing reasons, we will vacate the District Court's order of October 25, 2012, and remand for further proceedings consistent with this Opinion.